FIVE TOWNS COLLEGE, Appellant, v CITIBANK, N. A., Respondent.

Second Department, May 20, 1985

### APPEARANCES OF COUNSEL

*Ira H. Leibowitz, Lasky & Peterson* (*Robert M. Levine* of counsel), for appellant.

*Bigham Englar Jones & Houston* (*Peter Broeman* of counsel), for respondent.

### OPINION OF THE COURT

GIBBONS, J.

The issues raised on this appeal concern the propriety of Special Term's refusal to grant plaintiff partial summary judgment in its action to recover damages arising out of defendant's alleged improper payment of a series of checks bearing forged drawers' signatures, and its further decision to allow the defendant to amend its answer in order to assert, in effect, plaintiff's contributory negligence as an affirmative defense (CPLR 1411, 1412). In our view, the order, as amended, should be modified by deleting the provision granting leave to amend the answer in order to assert the aforementioned affirmative defense, and, as so modified, should be affirmed insofar as appealed from.

On or about September 3, 1979, plaintiff Five Towns College filed a signature card with defendant Citibank, N. A., designating its business manager (Mr. Martin Crafton), its president (Dr. Stanley G. Cohen), and its coordinator (Ms. Lorraine Kleinman) as the authorized signatories on its checking account No. 15107257. Previously, in March of 1979, the college had allegedly hired one Hilda Weisel as its new full-charge bookkeeper, and following the latter's untimely death in March of 1981, it was belatedly discovered that Ms. Weisel had embezzled in excess of $162,000 from the college by writing a series of checks to her own order and signing the names of either the college president (Dr. Cohen) or its coordinator (Ms. Kleinman). Citibank was notified of these forgeries on or about May 11, 1981, and following the latter's refusal to reimburse the plaintiff, this action was commenced in the Supreme Court, Nassau County,

in which the college sought to recover the full amount of the forged checks. Issue was joined by the service of an answer in which the defendant bank successively pleaded Uniform Commercial Code §§ 3-406 and 4-406 as affirmative defenses,[1] and following the service of answers to plaintiff's first set of interrogatories, the college moved for summary judgment in the principal amount of $104,625, representing the face amount of the 30 checks bearing the forged signature of Lorraine Kleinman which had been paid by the defendant during the 12 months preceding the first date of notification to the bank of the forgeries.

---

1. UCC §§ 3-406 and 4-406 pertinently provide as follows:

"§ 3-406. Negligence Contributing to Alteration or Unauthorized Signature

"Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

"§ 4-406. Customer's Duty to Discover and Report Unauthorized Signature or Alteration

"(1) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.

"(2) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by subsection (1) the customer is precluded from asserting against the bank

"(a) his unauthorized signature or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure; and

"(b) an unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding fourteen calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration.

"(3) The preclusion under subsection (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item(s).

"(4) Without regard to care or lack of care of either the customer or the bank a customer who does not within one year from the time the statement and items are made available to the customer (subsection (1)) discover and report his unauthorized signature or any alteration on the face or back of the item or does not within three years from that time discover and report any unauthorized indorsement is precluded from asserting against the bank such unauthorized signature or indorsement or such alteration."

It is not disputed that UCC 4-406 (4) bars the recovery of any items which had not been reported to the defendant bank within one year.

In support of its application, plaintiff annexed the affidavits of its business manager (Mr. Crafton) and its coordinator (Ms. Kleinman) to establish the facts regarding Ms. Weisel's employment, the forgeries, and her lack of authority to sign Ms. Kleinman's name, and also annexed copies of the defendant's answers to its first set of interrogatories. In them, the defendant admitted that it had not taken any steps whatsoever to verify the drawer's signatures on any of the plaintiff's checks, but claimed, in mitigation, that "[s]ignature verification would not have detected the alleged forgeries complained of in this action". Moreover, while no verification of any of these items was apparently attempted, Citibank did maintain that it had in effect at the operative time, a viable verification policy pursuant to which "[c]hecks drawn on end-of-month and special instruction accounts [were] signature verified".

In opposition, the defendant submitted an affidavit by an assistant manager of the defendant, employed at its Regional Processing Center, in which it was alleged, *inter alia,* that defendant presently lacked any knowledge or information regarding the existence or nonexistence of Hilda Weisel; that it had not, as yet, had the opportunity to depose Ms. Kleinman regarding either the fact of the "forgeries" or the existence of Ms. Weisel; that the "midnight deadline" for the acceptance or rejection of demand items imposed by UCC 4-302 (*see also,* UCC 4-104 [h]) renders the verification of signatures on every check impossible; that the verification procedure employed by Citibank constitutes the required exercise of "ordinary care" in the payment of customers' checks (*see,* UCC 4-406); and that there are other safeguards employed by Citibank in order to prevent the payment of unauthorized checks, e.g., the employment of magnetic ink character readers to make sure that every check which is actually paid is one of the preprinted checks which it sends to its depositors, thus insuring that if a check with a forged endorsement is paid "it would necessarily be [the] result of Citibank's customer having failed to exercise a sufficient degree of care to keep the magnetically encoded checks out of the hands of the forger or unauthorized signer". In addition, the defendant cross-moved for (1) partial summary judgment dismissing the complaint insofar as it pertained to the recovery of items paid more than one year prior to the date of its notification; and (2) for leave to amend its answer in order to assert a claim of contributory negligence against the plaintiff.

The plaintiff opposed the cross motion for leave to amend the answer, but on June 3, 1983, Special Term (Levitt, J.), granted

the cross motion and denied the plaintiff's motion, stating, in pertinent part, as follows:

"[C]ross-motions for consolidation and for dismissal of the counterclaim were previously granted to the extent of consolidation for joint trial pursuant to CPLR 602 (a) and deeming the counterclaim as an affirmative defense pursuant to CPLR 1403.

"UCC 4-406 (4) states in relevant part as follows:

" '(4) Without regard to care or lack of care of either the customer or the bank a customer who does not within one year from the time the statement and items are made available to the customer (sub-section [1]) discover and report his unauthorized signature * * * on the face or back of the item * * * is precluded from asserting against the bank such unauthorized signature'

"Accordingly, the defendant's cross-motion for partial summary judgment dismissing the complaint insofar as it seeks recovery for checks paid by it prior to May 11, 1980 is granted since the first notice to defendant of the alleged forgeries was by letter dated May 11, 1981. The claim is, therefore, reduced from $162,036.26 as demanded to $104,625.00, which is the total of the thirty (30) checks within the statutory one-year limit noted above (See *Mesnick v Hempstead Bank*, 106 Misc 2d 624).

"Plaintiff's motion for summary judgment based upon the alleged improper payment of the aforesaid thirty (30) checks is denied. Whether or not defendant failed to exercise ordinary care (See UCC 4-406 [3]) in payment of the proceeds of said checks to plaintiff's deceased bookkeeper, the alleged embezzler, who named herself as payee thereof and who allegedly forged the signature of an authorized corporate signatory thereon is a question of fact. Such a question of fact, not precluding others, mandates a denial of a summary disposition herein."

Subsequently, however, the court, *sua sponte,* amended its order, stating:

"On the Court's own motion and in an attempt to clarify the order of this Court Dated June 3, 1983, the Court amends said order by adding the following:

" 'The issue of contribution [contributory negligence] should be raised by affirmative defense rather than counterclaim (CPLR 1412). The Court grants the defendant permission to serve a second amended answer asserting the affirmative defense of contribution. Clearly, it was the legislature's intent to permit contributory fault to be asserted as a defense irrespective of the legal theory under which a plaintiff sues, i.e., not to limit that defense to negligence actions (*Lippes v Atlantic Bank of*

*New York,* 69 AD2d 127; 2A Weinstein, Korn Miller Parag. 1401.13)'

"As so amended, the order shall remain in full force and effect."

This appeal followed.

On appeal, it is the plaintiff's contention that Special Term erred in denying its motion for partial summary judgment on the 30 forged checks totaling $104,625 which the defendant had paid during the 12 months preceding its first notification of the forgeries (*cf.* UCC 4-406 [4]), since the admitted failure to attempt to verify any of the signatures of any of the plaintiff's checks constituted a "lack of ordinary care on the part of the [defendant] bank in paying the [contested] item(s)" as a matter of law (*see,* UCC 4-406 [3]). In addition, plaintiff maintains that the concepts of contributory negligence and comparative fault (CPLR arts 14, 14-A) are wholly inapplicable to an action, as here, predicated on contract and arising under the Uniform Commercial Code.

■■■ In our view, the existence of triable issues of fact, including, e.g., the existence of the alleged forger, her lack of authority to sign the disputed checks, and presence or absence of ordinary care on the part of the defendant bank in paying the contested items, precluded the entry of partial summary judgment in plaintiff's favor. However, we agree with the plaintiff that the principles of comparative fault should not be extended to alter the careful adjustment of the respective rights and obligations of a bank and its customers regarding the payment of checks bearing unauthorized or forged signatures set forth in the UCC. Accordingly, that aspect of the defendant's cross motion which sought leave to amend its answer in order to assert a claim for an apportionment of responsibility was not properly granted, and should have been denied in toto.

■ Assuming, arguendo, that plaintiff is correct in contending that the admitted failure of the bank to attempt any signature verification on any of the checks written against its account No. 15107257 constituted a per se failure to exercise ordinary care in the payment of such items (*see,* UCC 4-406 [3]; *see also,* UCC 3-406, 4-401 [1]), it is, nevertheless, plain that the plaintiff would not be entitled to partial summary judgment at this stage of the proceedings, as discovery has not, as yet, been completed, and the defendant is presently without sufficient knowledge to challenge either the existence of the alleged forger, the facts of her employment, or her lack of authority to sign the name of the plaintiff's authorized signatory, Ms. Kleinman. In fact, while

the UCC provides, *inter alia,* that an unauthorized signature (including a forgery) is (with exceptions not here relevant) "wholly inoperative as that of the person whose name is signed" (UCC 3-404 [1]), it also provides that an "unauthorized" signature is one which is made without the "actual, implied or apparent authority" of the person in whose name it is executed (UCC 1-201 [43]), the knowledge of which factors are presently beyond the defendant's reach. It is well established that summary judgment will not be granted without an opportunity to complete discovery where, as here, the facts necessary to oppose the motion lie peculiarly within the knowledge of the moving party (*see,* CPLR 3212 [f]; *Jered Contr. Corp. v New York City Tr. Auth.,* 22 NY2d 187, 194; *Nordlicht v Norton Simon, Inc.,* 70 AD2d 511; *White v First Natl. Bank,* 22 AD2d 973, 974; *see also, Himan v King Bear Auto Serv. Centers,* 62 AD2d 1010).

■ Quite apart from the foregoing, however, there is another, more central reason why summary judgment may not be granted in this case, as the defendant has affirmatively pleaded as a defense UCC 3-406 and 4-406, which provide, *inter alia,* that "[a]ny person who by his [own] negligence substantially contributes * * * to the making of an unauthorized signature is *precluded* from asserting the * * * lack of authority * * * against a drawee * * * who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's * * * business" (UCC 3-406; emphasis supplied), and that a customer's failure to exercise reasonable care and promptness in examining his bank statement and canceled checks for unauthorized signatures and in reporting the same to the drawee bank is precluded from asserting against said bank "an[y] unauthorized signature * * * by the *same* wrongdoer on any other item paid in good faith by the bank *after* the first item and statement was available to the customer for a reasonable period not exceeding fourteen calendar days and before the bank receives notification from the customer of any such unauthorized signature" (UCC 4-406 [2] [b]; emphasis supplied). Here, it is not contended by either party that any of the 30 items in issue were actually paid by the defendant bank within 14 days after the return to the plaintiff of the earliest items bearing the allegedly forged drawer's signatures (i.e., those items as to which recovery is barred by the one-year period of limitation set forth in UCC 4-406 [4]), and it is therefore apparent that but for the plaintiff's reliance on the statutory limitation imposed by UCC 4-406 (3), precluding a bank from asserting its customer's lack of notice regarding unauthorized signatures in any case where the latter can establish a "lack of ordinary care on the

part of the bank in paying the [contested] item(s)", that the bank would be entitled to summary judgment dismissing the complaint (*cf. Merrill Lynch, Pierce, Fenner & Smith v Chemical Bank,* 57 NY2d 439; *Ossip-Harris Ins. v Barnett Bank,* 428 So 2d 363 [Fla]; *Ind-Com Elec. Co. v First Union Natl. Bank,* 58 NC App 215, 293 SE2d 215).

Moreover, given the extreme length of time which expired in this case before any of the alleged forgeries were reported to the defendant, it can certainly be argued that, at least as to some of these items, the prolonged lack of detection on the part of the plaintiff constituted "negligence [on its part which] substantially contribute[d] * * * to the making of an unauthorized signature", thereby precluding the plaintiff from asserting the suspected forgeries against the defendant bank (*see,* UCC 3-406; *see also, K & K Mfg. v Union Bank,* 129 Ariz 7, 628 P2d 44; *Westport Bank & Trust Co. v Lodge,* 164 Conn 604, 325 A2d 222; *Ashley-Hall Interiors v Bank of New Orleans,* 389 So 2d 850 [La]; *Exchange Bank & Trust Co. v Kidwell Constr. Co.,* 463 SW2d 465, *writ of error refused* 472 SW2d 117 [Tex]; *but see, Hanover Ins. Cos. v Brotherhood State Bank,* 482 F Supp 501 [Kan]; *Jackson v First Natl. Bank,* 403 SW2d 109 [Tenn]). This, in and of itself, would appear to present a triable issue of fact precluding the entry of partial summary judgment in favor of the plaintiff (*see generally, Florea v Bank of New York,* 87 AD2d 526; *Key Appliance v National Bank,* 75 AD2d 92; *Advanced Alloys v Sergeant Steel Corp.,* 79 Misc 2d 149; *First Natl. Bank v Keshishian,* 427 So 2d 313 [Fla]; *Space Distribs. v Flagship Bank,* 402 So 2d 586 [Fla]; *see also, Federal Ins. Co. v Groveland State Bank,* 37 NY2d 252; *K & K Mfg. v Union Bank, supra; Exchange Bank & Trust Co. v Kidwell Constr. Co., supra; cf. Kosic v Marine Midland Bank,* 76 AD2d 89, *affd* 55 NY2d 621; *Titan Air Conditioning Corp. v Chase Manhattan Bank,* 61 AD2d 764), but it is argued, *inter alia,* that the foregoing is not the case here due to the defendant's admitted failure to verify the signatures on any of the items cleared through plaintiff's checking account during the period from November 1979 through March 1981. Such conduct, according to plaintiff, precludes the defendant from establishing that it acted "in accordance with the reasonable commercial standards of [its] * * * business" in paying the contested items, as required by UCC 3-406, as well as preventing the defendant from attempting to avoid liability by asserting as an affirmative defense plaintiff's apparent failure to detect the alleged forgeries (*see,* UCC 4-406 [2]). In so arguing, plaintiff relies, *inter alia,* on UCC 4-406 (3) which pertinently provides that "[t]he preclusion [set forth in] subsection (2) [regarding the

customer's failure to detect unauthorized signatures] does *not* apply if the customer establishes [a] lack of ordinary care on the part of the [drawee] bank in paying the [contested] item(s)" (emphasis supplied). According to the plaintiff, defendant's lack of ordinary care has been conclusively established herein.

Notwithstanding the undoubted facial appeal of plaintiff's position, we conclude that the alleged lack of care on the part of the defendant bank presents a triable issue of fact, since it is impossible to determine on the present state of the record whether the admitted verification policy of the defendant bank (i.e., the signature verification of checks drawn on end-of-month and special instruction accounts) is commercially reasonable (UCC 3-406) given the existence of the "midnight deadline" for the payment of demand items (UCC 4-302 [a]), and the realities of modern electronic banking in the New York metropolitan area (*see, Federal Ins. Co. v Groveland State Bank, supra,* p 259; *see also, First Natl. Bank v Keshishian, supra*). Ironically, the same problem also prevents the entry of partial summary judgment based on the statutory preclusion set forth in UCC 4-406 (3), for while the statute speaks in terms of a "lack of ordinary care" on the part of the drawee bank, UCC 4-103 (3) provides, *inter alia,* that "action or non-action consistent with clearing house rules * * * or with a *general banking usage not disapproved by this Article,* prima facie constitutes the exercise of ordinary care" (emphasis supplied). Thus, the operative standard in either instance is much the same (*cf. Morgan v United States Mtge. & Trust Co.,* 208 NY 218, 224) and cannot be determined on the present record.

Notably, no case has been cited to this court in which partial summary judgment has been granted *against* a bank on the theory that it had failed to exercise the requisite degree of care in honoring customers' checks bearing unauthorized drawers' signatures. Moreover, in the one such case disclosed by our independent research, it appears that the plaintiff's moving papers contained uncontroverted documentary evidence that the defendant's conduct in cashing a check made payable to the plaintiff corporation in violation of a resolution on file with the bank, fell well below any acceptable standard of professional care (*Empire Moving & Warehouse Corp. v Hyde Park Bank & Trust Co.,* 43 Ill App 3d 991, 357 NE2d 1196; *cf. Ossip-Harris Ins. v Barnett Bank,* 428 So 2d 363, *supra; Ind-Com Elec. Co. v First Union Natl. Bank,* 58 NC App 215, 293 SE2d 215, *supra* [summary judgment granted in *favor* of the drawee bank where uncontroverted documentary evidence established both the extent of care exercised by the defendant bank and its conformity

with generally accepted banking standards]). No comparable showing has been made in the case at bar. Apparently, with these lone exceptions, the extent of care exercised by a drawee bank under the UCC in honoring a forged check has routinely been held to present a triable issue of fact for the jury to determine (*see, Federal Ins. Co. v Groveland State Bank, supra; Florea v Bank of New York,* 87 AD2d 526, *supra; Key Appliance v National Bank,* 75 AD2d 92, *supra; First Natl. Bank v Keshishian, supra; Space Distribs. v Flagship Bank,* 402 So 2d 586, *supra; see also, K & K Mfg. v Union Bank,* 129 Ariz 7, 628 P2d 44, *supra; Exchange Bank & Trust Co. v Kidwell Constr. Co.,* 463 SW2d 465, *supra; cf. Perley v Glastonbury Bank & Trust Co.,* 170 Conn 691, 368 A2d 149; *Hanover Ins. Cos. v Brotherhood State Bank, supra* [trial court's factual conclusion that defendant banks' failure to attempt *any* verification of drawers' signatures or to detect *any* alterations in payees' names did not constitute adequate care affirmed on appeal[2]]; *but see, Jackson v First Natl. Bank,* 403 SW2d 109, *supra* [holding based on a pre-UCC decision by the Supreme Court of Tennessee]).

■ Turning to a consideration of the second issue presented, it is our belief that leave to amend defendant's answer in order to assert the plaintiff's contributory negligence as an affirmative defense (CPLR 1411, 1412) was not properly granted, for notwithstanding the fact that a claim for an apportionment of liability is no longer restricted solely to causes of action predicated on negligence (*see, Nassau Roofing & Sheet Metal Co. v Celotex Corp.,* 74 AD2d 679, 681; McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C1411:1, p 386), and has been extended, e.g., to include causes of action sounding in breach of warranty and strict products liability (*see, Lippes v Atlantic Bank,* 69 AD2d 127, 137), the seminal issue, as we see it, is not whether, in the broadest sense, the breach of a duty arising out of contract is amenable to the interposition of such an affirmative defense, but, rather, whether the concept of comparative fault is a permissible vehicle to vary the respective rights and obligations under the UCC of the parties to a negotiable instrument. In our view, this question should be answered in the negative, as the balancing of rights under the UCC represents the ultimate distillation of a painstaking process of evolution, pursuant to which the risk of

---

2. By way of contrast, there is an existing program for the verification of drawers' signatures in the case at bar (i.e., checks drawn on end-of-month and special instruction accounts are signature verified), and it is the adequacy of those procedures combined with the other safeguards employed by the defendant bank which is in dispute.

loss in commercial matters has been attempted to be adjusted in a fair and equitable manner.

Thus, it is specifically provided by statute that a drawee bank cannot, as a general rule, charge its customer for items paid upon a forged drawer's signature (see, UCC 3-404 [1]; 4-401 [1]; see also, White v First Natl. Bank, 22 AD2d 973, supra; 3 Anderson, Uniform Commercial Code § 4-401:5 et seq., at 301-302 [2d ed]), but that where the drawer has, by his own negligence "substantially contribute[d] * * * to the making of an unauthorized signature, [he] is precluded from asserting the * * * lack of authority against * * * a drawee or other payor who pays the instrument in good faith and in accordance with reasonable commercial standards" (UCC 3-406; see also, Fitzgibbons Boiler Co. v National City Bank, 287 NY 326). However, if the drawee has also acted unreasonably, the preclusion is withdrawn and the bank will remain liable to its depositor. Moreover, where, as in the case at bar, an unauthorized signature is in issue, the customer may still be precluded from recovering against his bank on those items whose payment could have been prevented had he acted reasonably in examining his bank statement and canceled checks (UCC 4-406 [2]; see, Stella Flour & Feed Corp. v National City Bank, 285 App Div 182, affd 308 NY 1023). Again, the preclusion is withdrawn if the bank has failed to employ "ordinary care * * * in paying the [contested] item(s)" (UCC 4-406 [3]), but, notwithstanding the foregoing, recovery is barred as to those items with respect to which the bank's customer "does not within one year from the time the statement and [the] items are made available to [him] * * * discover and report his [own] unauthorized signature" (UCC 4-406 [4]).

In our view, the foregoing balancing of the respective rights and duties was intended to be exclusive, and any alteration in the underlying pattern of liability should not be based upon the vague (in this application) language of CPLR 1411 and 1412. As the Court of Appeals stated in another context in Underpinning & Foundation Constructors v Chase Manhattan Bank (46 NY2d 459, 468-469):

"It is basic to the law of commercial paper that as between innocent parties any loss should ultimately be placed on the party which could most easily have prevented that loss. Hence, in most forged indorsement cases, the party who first took the check from the forger will ultimately be liable, assuming of course that there is no solvent forger available. This is so because it is the party who takes from the forger who is in the best position to verify the indorsement. This is not always true,

however, and if the forgery is the result of some other interested party's negligence, the burden may ultimately be placed on that party (see Uniform Commercial Code, § 3-406). In certain instances in which it is clear that the loss could have been most readily prevented by the drawer, the code may place the loss upon the drawer as a matter of law (Uniform Commercial Code, § 3-405). One such situation might be that alleged to be present in this case, in which the indorsement of a named payee has been forged by 'an agent or employee of the maker or drawer [who] has supplied him with the name of the payee intending the latter to have no such interest' (Uniform Commercial Code, § 3-405, subd [1], par [c]). In such cases, the indorsement is deemed to be effective and the drawer is thus precluded from recovering solely on the basis of the forgery from banks which honor the check. The reason for this rule is that it is believed that as a practical matter the drawer is in a better position to prevent the fraud by utilizing proper accounting methods, than is even the first party to take from the forger. Although this presumption is not free from criticism, and may in some instances be less than sound, the language of the code makes it applicable.

"Had the forger in this case not forged a check with a restrictive indorsement, it would appear that the loss might properly be placed upon a drawer alone. A restrictive indorsement, however, imposes a new and separate duty upon a transferee to pay the check only in accord with the restriction. In this case, the restrictive indorsements required that the checks be deposited only in the accounts of the respective restrictive indorsers, the named payees. This was not done and the failure to do so serves as a basis for liability independent of any liability which might be created by payment over a forged indorsement alone.

"It has been suggested that it is illogical to reach a different result dependent only on whether the forger adds a restriction to the indorsement or not. Although superficially attractive, this argument could as readily serve as a challenge to the soundness of the code provisions imposing a liability upon the drawer where the forger has chosen to act in one way rather than another (see Uniform Commercial Code, § 3-405). *The obvious flaw in the argument made is that it ignores the prime function of all these rules and distinctions: to impose liability on the party which could most readily have prevented the fraud.* Where the only defect is the forgery itself and the forgery could and should have been prevented by the drawer, liability is imposed on the drawer. Where, however, as here, the indorsement is not only forged but is also restrictive, and the check is presented in what

appears on its face to be an obvious violation of that restriction, then the situation is different, and the balance of obligations and potential liabilities shifts. That an indorsement is forged does not serve to justify a failure to apply normal commercial standards with respect to any restrictions imposed by the indorsement. The presence of a restriction imposes upon the depositary bank an obligation not to accept that item other than in accord with the restriction. By disregarding the restriction, it not only subjects itself to liability for any losses resulting from its actions, but it also passes up what may well be the best opportunity to prevent the fraud. The presentation of a check in violation of a restrictive indorsement for deposit in the account of someone other than the restrictive indorser is an obvious warning sign, and the depositary bank is required to investigate the situation rather than blindly accept the check. Based on such a failure to follow the mandates of due care and commercially reasonable behavior, it is appropriate to shift ultimate liability from the drawer to the depositary bank" (emphasis supplied; *see generally, Merrill Lynch, Pierce, Fenner & Smith v Chemical Bank,* 57 NY2d 439, *supra; Tonelli v Chase Manhattan Bank,* 41 NY2d 667; *but see, Sun'N Sand v United California Bank,* 21 Cal 3d 671, 582 P2d 920).

Similarly, to superimpose upon the established pattern of liability set forth in the UCC a further level of claims and defenses predicated on *sui generis* considerations of comparative fault would, in our view, fundamentally alter the character of that legislation without any expression of a comparable legislative intent (*see generally,* McKinney's Cons Laws of NY, Book 1, Statutes §§ 391, 396).

*Lippes v Atlantic Bank* (69 AD2d 127, *supra*) is not to the contrary, as the allocation of risk under the UCC was not directly implicated in the First Department's decision to permit contribution in that action. Moreover, the principal issues to be decided in that case were whether contribution could be had in a tort action arising out of the commercial relationship between a factor and his depositary bank, and whether the actual diminution of a decedent's estate caused by the alleged negligence of a bank in processing certain promissory notes for collection constituted an "injury to property" within the meaning of CPLR 1411. The court answered both questions in the affirmative, stating (*supra,* pp 136-137, 141):

"Surely, the logic underlying the *Dole* rules and the rules themselves were expressed in generic terms to apply not only to the facts in *Dole,* but to all manner of tort liability of every

description to which apportionment of damages may be readily applied without doing violence to substantial interests. We find no distinction in logic or *Dole,* which limits application of the rules merely to 'accident' cases to the exclusion of all other causes pursued under a theory of tort liability. To exclude apportionment of damages in a tort action arising from commercial relationships and to insist that contributory negligence remain a bar to any recovery in such cases, would perpetuate the injustice *Dole* addresses and deny the ameliorative effect established by it and its progeny. It is 'pragmatically sound, as well as realistically fair' to permit apportionment among 'joint or concurrent tort-feasors regardless of the degree or *nature* of the concurring fault.' (*Kelly v Long Is. Light. Co.,* 31 NY2d 25, 29 [emphasis added].) * * *

"Further, the use of the term 'culpable conduct' in CPLR 1411, rather than 'negligent conduct', presents further support to the view that the legislative intent was to release the concept of damage apportionment from the parochial confines of accident cases and to broaden its application flexibly 'to reach any breach of legal duty or fault by the defendant, including *but not limited to* negligence in any degree, breach of warranty, strict liability and violation of a statutory duty.' (Homburger, The 1975 New York Judicial Conference Package, 25 Buffalo L. Rev 415, 434; emphasis added.) 'Judicial development of the concept of "culpable conduct" consistent with the goal of this article [CPLR art 14-A] is not precluded.' (Occhialino, Comparative Negligence, Special 6-Month Report of the Judicial Conference, State of New York, 1975, pp 139-140; 2A Weinstein-Korn-Miller, NY Civ Prac, par 1411.04.) Harms specifically not mentioned in the act can be included 'if court determines the common law of the state would make the application'. (Schwartz, Comparative Negligence, § 2.3, p 38; § 21.4, p 130.) Accordingly, one commentator suggests that our 'comparative negligence' law be renamed generically as the 'comparative fault' law. (Krause, Comparative Negligence in New York, 47 NYSBJ 638, 639.) * * *

"What becomes apparent from a reading of the cases is that any tortious act (other than personal injury) resulting in damage (i.e., 'whereby the estate of another is lessened'; General Construction Law, § 25-b) constitutes an 'injury to property' within the contemplation of CPLR 1401 and 1411. Given that logically broadened meaning, the 'culpable conduct' of the defendants here resulted in an injury to plaintiff's property and justified an appropriate application of damage apportionment between the parties."

In fine, while much of this broad language is perhaps susceptible to an interpretation which would authorize a claim for an apportionment of liability in the case at bar, in our view, the decision in *Lippes* (*supra*) should not be extended into the present area, especially where its ultimate effect would be to materially alter the respective rights and obligations of the parties to a negotiable instrument under the UCC.

Accordingly, the order appealed from, as amended, should be modified by deleting the provision granting leave to amend the defendant's answer and, as so modified, should be affirmed insofar as appealed from.

TITONE, J. P., MANGANO and O'CONNOR, JJ., concur.

Order of the Supreme Court, Nassau County, dated June 3, 1983, as amended by order of the same court dated July 7, 1983, modified by deleting therefrom the provision granting that branch of the defendant's cross motion which sought leave to amend its answer to assert the affirmative defense of the plaintiff's contributory negligence, and substituting therefor a provision denying that branch of the cross motion. As so modified, order as amended affirmed insofar as appealed from, without costs or disbursements.