**AMERICAN TITLE INSURANCE COMPANY**

v.

**SHAWMUT BANK OF RHODE ISLAND, N.A. as Successor by Merger to People's Bank, N.A.**

**Civ. A. No. 90–0476 P.**

United States District Court, D. Rhode Island.

Feb. 11, 1993.

---

**302**

Stephen P. Sheehan, Wistow & Barylick, Providence, RI, for plaintiff.

Steven E. Snow, Partridge, Snow & Hahn, Providence, RI, for defendant.

## OPINION AND ORDER

RAYMOND J. PETTINE, Senior District Judge.

Following a series of transactions involving the brokering of purchase money mortgage loans between purchasers of real estate and loan wholesalers, the defendant bank debited a client's account on the forged endorsement of checks payable to another. The central issue I must resolve is whether or not the defendant bank's actions comported with reasonable commercial standards. In the factual context of this case, I find that it did not.

### I.

The involved parties are American Title Insurance Company ("American Title"), a Florida corporation, the plaintiff; American Financial Corporation ("American Financial"), of Tampa, Florida, secondary investor as mortgage purchaser; East–West Financial Corporation ("East–West"), of Rhode Island, broker of purchase money mortgage loans; Gary Garabedian, president and owner of East–West; Shawmut Bank of Rhode Island, N.A., as successor by merger to People's Bank, N.A., a Rhode Island bank, the defendant; George Marderosian, a Rhode Island attorney, the forger and borrower; and Michael DiChiro, a Rhode Island attorney, designated as title attorney.

George Marderosian was an active practitioner in Rhode Island specializing in real estate law. He represented East–West and Garabedian in approximately 100–110 loan transactions that required preparation of loan documents, title searches, issuance of title insurance policies—which he did as the authorized policy-issuing agent of the plaintiff—and the disbursement of the loan proceeds. In the handling of these accounts, he utilized an escrow account in the Attleboro Pawtucket Savings Bank in the name of Marderosian, Marderosian & Calenda. Calenda was his partner and a close friend of DiChiro.

I will recite only those facts which are pertinent and necessary to resolve this controversy. In January of 1989, Marderosian, acting for himself, negotiated with East–West through Garabedian, a replacement mortgage in the amount of $605,280.00 on a condominium in which he had an interest. For the financing of this loan, East–West utilized American Financial. American Financial, in turn, was to receive a first mortgage lien. Marderosian knew that East–West was not going to be funding the loan but would act as a "pass-through" for American Financial.

The loan was approved, and since Marderosian was the borrower, East–West would not permit him to act as the closing attorney. Pursuant to R.I.G.L. § 19–10–9,[1] Marderosian nominated DiChiro, an attorney who had been a member of the bar for only two years and who was woefully inexperienced in real estate matters. DiChiro revealed his lack of qualifications, but was assured by Marderosian that it should not concern him because East–West and Marderosian, Marderosian & Calenda would do all that was necessary, including title searches, preparation of title insurance policies, obtaining payoff figures for prior mortgage loans, etc. After all this preparatory work was completed and approved, East–West and Marderosian arranged to have the money paid in two installments: $403,529 at a first closing on February 15, 1989, and $201,760 at a second closing which took place on March 3, 1989.

On February 15, 1989, DiChiro went to Marderosian's office where he notarized the necessary signatures and signed the settlement sheets prepared by Marderosian, Marderosian & Calenda. No funds from either the lender or borrower were provided or changed hands at this closing, yet the settlement sheets falsely indicated that Marderosian had paid the deficiency amount to be added to the loan that was necessary to pay off the existing mortgages. That is, the loan proceeds were not sufficient to satisfy the existing mortgage lien that had to be wiped out in order to give the lender a first mortgage as agreed. Another irregularity at this closing was the issuance of title policies on behalf of American Title Insurance Company. On the assurance of Marderosian, these policies were signed by DiChiro, who was not an authorized agent of the title company. All these documents were forwarded by East–West to American Financial which then wired $403,520 for the purchase of the loans to East–West's account at Shawmut. On February 27, 1989, East–West issued its check for $403,520 payable to the order of Michael DiChiro, Jr. The events which transpired from this point on are accurately recited in defendant's brief at page 8:

> On February 27, 1989, East–West issued Check No. 2546 on East–West's funding account with People's in the amount of $403,520 payable to the order of *Michael DiChiro, Jr.* Mr. Garabedian telephoned Attorney DiChiro and informed him that the loan proceeds check was payable to

1. 19–10–9. Lending institutions—Title attorneys.—Every bank, trust company, loan investment company, and credit union or any other lending institution which accepts an application for any residential mortgage loan or any commercial mortgage loan and which requires that a title attorney search the title of the subject real estate shall first permit the prospective mortgagor to select a qualified title attorney of his or her own choice to search the title of the subject real estate, provided the lending institution may require the prospective mortgagor to provide it with a title insurance policy in the amount of the mortgage.

In the event the prospective mortgagor does not select a qualified title attorney, then the prospective mortgagor shall sign a waiver permitting the lending institution to select its own attorney.

DiChiro and was ready to be picked up at East–West's offices. DiChiro told Garabedian he would contact George Marderosian's secretary and make arrangements to have the check picked up. The arrangements were made by Garabedian and a messenger who worked regularly for Marderosian went to East–West and picked up the check. The messenger brought the check to George Marderosian. (Citations to transcript omitted) (emphasis added).

Marderosian then advised DiChiro he had the check and would "handle it." DiChiro's conduct in accepting this from Marderosian is not material and need not be discussed. Marderosian did indeed "handle it." He forged the endorsement "Michael DiChiro" (omitting "Jr."), and stamped the check, "For Deposit Only—Marderosian, Marderosian & Calenda, Attorneys at Law," and presented it to the firm's bank, Attleboro Pawtucket Savings Bank, which in turn conditionally credited the account. The check was then forwarded to Shawmut Bank, which debited East–West's account without authenticating DiChiro's endorsement or noting that the endorsement was not substantially identical to the name of the payee.

The second closing took place on March 3, 1989. The pattern of conduct was substantially the same as transpired in the first. This second check in the amount of $201,760 was made payable to "Attorney Michael DiChiro, Jr." The forged endorsement on this check omitted "Attorney."

Marderosian gave DiChiro a check for $500 as his fee and then withdrew the balance of the funds from the escrow account; he did not use any of the proceeds to satisfy the prior mortgages. (As an aside, Marderosian has been convicted of fraud and is currently serving a sentence in a federal prison. Defendant Shawmut Bank's Post–Trial Memorandum at 11.)

American Financial, learning that its mortgages were defective, sued American Title. American Title in turn sued DiChiro. American Title and DiChiro's malpractice carrier settled with American Financial contingent on receiving from American Financial an assignment of all the rights it had against People's.

On August 23, 1990, American Title, East–West, and Garabedian entered into an agreement whereby East–West and Garabedian assigned to American Title all rights, causes of action and ownership pertaining to the two checks in question in this action.

At trial, American Title conceded that East–West was negligent and that East–West's negligence substantially contributed to the forgery.

## II.

American Title brings this action as assignee of East–West. It claims that the defendant breached a contractual duty it had to East–West not to pay the checks at issue here over the forged endorsements of DiChiro. In response, the defendant asserts (1) that the assignment by East–West to American Title is invalid for lack of consideration; (2) affirmatively that East–West was negligent, citing R.I.G.L. § 6A–3–406; and (3) that the checks were paid in accordance with reasonable commercial standards.

### A.

I quite agree with defendant's comment in its Post–Trial Memorandum at page 14 that this is not the usual forged endorsement case. It is a tangled mess spawned by the Marderosian forgery and the closing procedures employed.

■ Certain general propositions can be established: a check bearing a forged endorsement is not "properly payable" within the terms of Rhode Island General Laws § 6A–4–401(1). *See, e.g., Medford Irrigation District v. Western Bank*, 676 P.2d 329, 332 (Or.Ct.App.1984); *also Perini Corp. v. First National Bank of Habersham County*, 553 F.2d 398, 403 n. 7 (5th Cir.1977). Absent negligence on the part of the drawer, which East–West admits, the drawee is liable for disbursement of funds on a forged endorsement since a check would not be "properly payable." However, East–West is claiming that its

negligence is no bar since Shawmut did not comport with commercially acceptable standards and so Shawmut is, nevertheless, liable to it. In response, the defendant contends that American Title cannot assert any such claims because the genesis of any such right is the assignments, which were worthless. In addition, the defendant asserts that both Shawmut and Attleboro Savings acted in good faith and in accordance with reasonable commercial standards in paying the two checks at issue.

■ I turn first to the consideration issue. A chose in action is assignable and enforceable provided it is supported by adequate consideration. *Hospital Service Corp. v. Pennsylvania Ins. Co.*, 101 R.I. 708, 227 A.2d 105, 109 (1967); *see also Sankin v. 5410 Connecticut Ave. Corp.*, 281 F.Supp. 524, 558 (D.D.C.1968), *aff'd*, 410 F.2d 1060, *cert. denied*, 396 U.S. 1041, 90 S.Ct. 681, 24 L.Ed.2d 685 (1970). I find that there was adequate consideration to support the assignments at issue.

■ Defendant's lack of consideration argument is premised on the following reasons:

1. East–West never filed a claim against American Title.

2. American Title paid no money to East–West for any claim and "never paid East–West anything in return for the purported assignment."

3. While American Title gave East–West a conditional release as consideration, this was of no value since American Title had no claim against East–West.

I am not persuaded. The settlement of the suit by American Financial against American Title included the assignment by American Financial to American Title of all causes of action it had against East–West, Shawmut, and Attleboro Savings. On August 23, 1990, East–West assigned to American Title all rights it had in the two forged checks. It follows that American Title stands in the place of American Financial and East–West. Thus, American Title could sue for the harm caused to American Financial and to itself.

It cannot be disputed that American Financial had a colorable claim against East–West for negligence and for breach of contract for selling a mortgage without first clearing prior mortgages. And American Financial also had a claim against Shawmut by virtue of East–West's assignment. In addition, it seems apparent to me, it had a direct claim against American Title for issuing a title policy insuring a clear title which did not exist—to the serious financial harm of American Financial.

The defendant is asking me to inquire into the possibility or likelihood of American Title's success on these claims—that asks too much. There is nothing in this record showing that these claims were not "premised on an honest belief in [their] justness;" consequently, they "constitute[ ] consideration sufficient to support a promise even though, if prosecuted, [they] might have been defeated." *Lapan v. Lapan*, 100 R.I. 498, 217 A.2d 242, 244 (1966).

American Title is a proper plaintiff in pursuit of this action against the defendant.

### B.

■ Having concluded that the assignments were valid, in order for the defendant to avoid liability, it must satisfy the requirements of the Uniform Commercial Code, R.I.G.L. § 6A–3–406.[2] It must show, as the plaintiff argues, that East–West was negligent, and that such "negligence substantially contribut[ed] to [the] material alteration of the instrument or to the making of an unauthorized signature"—that is, the forgery. Now, here, there is an admission of negligence and that such negligence substantially contributed to the forgery. Nevertheless, as already stated, the plaintiff

---

**2.** 6A–3–406. Negligence contributing to alteration or unauthorized signature.—Any person who by his or her negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the altera-tion or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

contends the defendant is liable since its conduct in paying the checks violated reasonable commercial standards.

Identifying the applicable legal standards in evaluating the defendant's conduct to determine whether or not it acted in accordance with "reasonable commercial standards" is difficult because of the nebulous state of the law. From the caselaw emerges only one predicate—"reasonable commercial standards" is, in the main, determined on a case by case basis. Candidly, analogies and extrapolations of individual cases from different jurisdictions could be argued to support either side. However, I find that the evidence in this case is impressively weighted in favor of the plaintiff and requires me to conclude that the defendant cannot invoke commercially reasonable conduct as a defense.

First, looking to Rhode Island law, I find only one relevant case, *Rhode Island Hospital Trust National Bank v. Zapata Corporation*, 848 F.2d 291 (1st Cir.1988). In that case, a Zapata Corporation ("Zapata") employee stole some of her employer's blank checks and forged a large number in amounts of $150–$800 each on her employer's account at Rhode Island Hospital Trust National Bank ("Hospital Trust"). Over a five month period, Hospital Trust received and paid them. Bank statements were regularly sent to Zapata. The forgeries were reflected in these statements starting in early April 1985, but were not detected by Zapata until three months later, in July of 1985. Zapata immediately notified Hospital Trust, which stopped clearing them. Unfortunately, by that time Hospital Trust had already processed and paid forged checks amounting to $109,247.16.

The district court ruled, *inter alia*, that as to all forged checks cleared on or after April 25, 1985, Hospital Trust need not reimburse Zapata because of its failure to exercise "reasonable care and promptness to examine the [bank] statement." On appeal, the First Circuit addressed the question of whether Hospital Trust exercised "ordinary care" under R.I.G.L. § 6A–4–406. Section 6A–4–406 relates to the bank customer's duty to discover and report un-

authorized signatures or alterations of debit entries in their accounts. The general rule is that a bank must reimburse an innocent customer for forgeries that it honors. R.I.G.L. § 6A–3–401(1). But § 6A–4–406 provides an exception where a bank customer has had a chance to inspect their bank statements, and has failed to promptly notify the bank of the problems. There is an exception to this exception, which provides that the customers are protected if they can show that the bank lacked "ordinary care" in paying the items. The First Circuit held that the bank had exercised "ordinary care" where it had a practice of examining all signatures on checks for more than $1000, examining signatures on checks between $100 and $1000 if there was reason to suspect a problem, and examining signatures of a randomly chosen one percent of all other checks between $100 and $1000. *Id.* at 294–95. The court noted that Hospital Trust's scheme was used by a majority of American banks.

Research of other jurisdictions did not uncover cases that exactly fit the facts at play in this case. However, I look to them for guidance.

In *Trust Company of Georgia Bank, N.A. v. Port Terminal & Warehousing Co.*, 153 Ga.App. 735, 266 S.E.2d 254 (1980), a company employee forged $18,000 in company checks and deposited them in her personal account. The Georgia Court reversed a grant of summary judgment in favor of the company. Among other things, the court held that the mere failure of banks to check the validity of ostensibly valid endorsements on third-party checks is not commercially unreasonable as a matter of law. Rather, the court wrote, "the true rule is whether a reasonable man in accordance with reasonable commercial standards would be put on notice of some impropriety appearing either from the form of the instrument and its endorsements or from knowledge of facts outside the instrument itself." 266 S.E.2d at 258. In reversing the grant of summary judgment against the bank, the court was particularly swayed by the fact that the checks were: (1) not so irregular on their face; (2) did not contain a restrictive or improper en-

dorsement; (3) not cashed, but deposited into an account of a customer (the forger). *Id.* at 258–59.

In *Medford Irrigation District v. Western Bank, supra,* an Oregon court found that a bank failed to exercise "ordinary care" or comport with "reasonable commercial banking standards" where it automatically paid all checks under $5000 without any procedure to detect unauthorized signatures on those checks. In *Twellman v. Lindell Trust Co.,* 534 S.W.2d 83 (Mo.Ct. App.1976), a $50,000 loan check made out "International Harvester" was given to a forger named Michael Londe, who wrote on the check "Pay to the order of Michael Londe Roedel Brothers Internation Harvester Trucks." The check was accepted by the depository bank and forwarded to the payor bank where it was ultimately honored. The court found both the depository bank and payor bank not to have acted commercially reasonable fashion in processing this check without inquiring about the endorsement. The court noted that the forged endorsement contained one typographical error, a misspelled name and was clearly not in the name of the payee. *Id.* at 92.

■ Several general legal propositions can be gleaned from this and other multistate caselaw. First, the question of whether a bank acted with commercial reasonableness is ordinarily a question of fact. *Curtis v. Hibernia National Bank,* 522 So.2d 705, 508 (La.Ct.App.1988); *Five Towns College v. Citibank, N.A.,* 108 A.D.2d 420, 489 N.Y.S.2d 338, 344 (1985); *Aetna Casualty & Surety Co. v. Hepler State Bank,* 630 P.2d 721, 728 (Kan.Ct. App.1981). Second, the party seeking to benefit from this preclusive provision has the burden of proof. Thus, the bank must prove that it acted in a commercially reasonable manner. *McDowell v. Dallas Teachers Credit Union,* 772 S.W.2d 183, 192 (Tx.Ct.App.1988); *Perley v. Glastonbury Bank & Trust Co.,* 170 Conn. 691, 368 A.2d 149, 155 (1976).

■ Third, the fact that a particular practice is common among banks does not establish that it is commercially reasonable.

*Perley,* 368 A.2d at 155. An intermediate Colorado court has stated that "[w]hether a bank has acted in a commercially reasonable manner is generally a question of fact, to be decided in the context of the specific record and in the light of normal business transactions." *Central, Inc. v. Cache National Bank,* 748 P.2d 351, 353 (Colo.Ct. App.1987). Another court has stated that "[t]he reasonableness of commercial banking standards must be analyzed in the context of the bank's duty in relation to the depositor's account." *Medford,* 676 P.2d at 332.

■ Though the foregoing cases do not fit four square to the problem at hand, certain conclusions can be drawn and appropriately applied here:

1. The burden of proving conduct in accordance with "reasonable commercial standards" is on the bank.

2. The bank should employ some kind of a forgery-detection scheme to satisfy "reasonable commercial standards." While *Rhode Island Hospital Trust National Bank, supra,* interpreted a different provision of Rhode Island law, it does support this second proposition.

Shawmut's argues—as presented by their expert witness—that it is commercially reasonable for a bank to allow a law firm to deposit third-party checks into a client's escrow account where the check is endorsed by the payee and there is a bona fide endorsement "for deposit only" to the law firm's account without authenticating the endorsements. More relevant to the case at hand, Shawmut posits "that it is within the reasonable commercial standards of the industry for the payor bank to have paid the check as presented without verification of the authenticity of the payee's signature because it would be impossible to do so." Defendant Shawmut's Post–Trial Memorandum at 21.

On the facts presented, Shawmut has not satisfied its burden of proof on why it did not, or could not, check the authenticity of the payee's signatures in this case. Shawmut's position may be compelling for routine checks. But where, as in this case,

there is a nonrestrictive, imprecise endorsement on two gargantuan checks, their argument collapses. Indeed, the size of these checks alone is enough to place an extremely high burden on Shawmut to justify why it did not inquire about the endorsements.

In sum, having failed to offer concrete evidence on what type of forgery-detection scheme it has in place, if any, Shawmut has not satisfied its burden of proving conduct in accordance with reasonable commercial standards. I find that Shawmut Bank did not act in a commercially reasonable manner and thus cannot invoke § 6A–3–406 as a defense. Judgment will be entered for the plaintiff.

SO ORDERED.