MILDRED LIPPES, as Executrix of ABE LIPPES, Deceased, Appellant, v ATLANTIC BANK OF NEW YORK et al., Respondents, et al., Defendants.

First Department, July 10, 1979

## APPEARANCES OF COUNSEL

*Ira A. Turret* of counsel (*Arthur N. Field* with him on the brief; *Field, Lomenzo & Turret, P. C.,* attorneys), for appellant.

*Martin I. Shelton* of counsel (*Milton S. Gould* and *Dean G. Yuzek* with him on the briefs; *Shea Gould Climenko & Casey,* attorneys), for Atlantic Bank of New York, respondent.

**OPINION OF THE COURT**

KUPFERMAN, J.

Abe Lippes, now deceased,[1] had been engaged for many years in the financing business involving the purchase, at discount, of accounts receivable and making collateralized loans.

Defendant, George Schorr, had been engaged for many years in the business of selling jewelry at wholesale, doing business as 211 Canal, Inc., a wholly owned corporation. A relationship between the two was first established in 1973, when Schorr requested and Lippes agreed to discount promissory notes, which Schorr allegedly received as payment from his customers, payable either to himself or his corporation. The first notes discounted as well as all subsequent notes delivered by Schorr were, in turn, delivered by Lippes for collection to defendant-respondent Rainer Murray, as collection manager of defendant-respondent bank, Atlantic Bank of New York, where Lippes maintained an account for collection for many years. Upon such delivery, Lippes received a receipt therefor and thereafter a formal written acknowledgment, setting forth the name of the makers, the date and place of payment (i.e., the maker's bank), and the amount of the note.

The evidence further reveals that either before or shortly after the purchase of any notes, Lippes verified the alleged makers' satisfactory credit standing and, in general terms, their bank balance, by receiving written advice, in some cases, from the credit personnel of the payee bank, and where a written statement was unavailable, then telephone confirmation was solicited and secured. Such verification was not further pursued by direct personal contact with the makers. The Atlantic Bank's expert witness testified that the custom and practice applicable to the negotiation in New York City of commercial paper would require the purchaser to communicate with the maker to ascertain the validity of a note; however, he agreed that factoring is also done, at the seller's request, without prior or subsequent communication by his purchaser with the maker, but in such instances it is the usual practice for the factor to examine the seller's books to ascertain if the notes arose in the seller's ordinary course of business and were "valid receivables". It appears that Lippes

---

1. Mildred Lippes, as executrix, has been substituted as plaintiff-appellant.

did not examine Schorr's books prior to or immediately after the purchase of any notes.

For over two and a half years, Lippes continued to factor such notes, purchasing them on a regular basis from Schorr, then depositing them for collection with Murray, receiving receipts and subsequent written acknowledgments of such deliveries, and when a note was paid, Lippes would receive an "Advice" from his bank that payment was made and the proceeds thereof (less a small collection fee) credited to Lippes' account. In each instance, there appeared nothing on the face of such "Advice", which would have alerted Lippes in any way that a note was collected in any fashion other than by means of the usual and required collection process. Although some of the early notes purchased by Lippes were genuine and were paid through formal presentment for collection through the Atlantic Bank, the bulk of the notes were admittedly forged by Schorr, without the knowledge of the purported makers.

The fact of the forgeries, during the whole of that two- and a-half-year period, was effectively kept from Lippes by means of an ingenious but simple scheme devised by Schorr, with the co-operation and assistance of Murray who, apparently, was unaware of the forgeries, and because of the failure of other bank personnel and officials carefully and properly to check and supervise the operations of the bank's collection department and particularly that of its collection manager, Murray.

Schorr's scheme was to arrange with Murray, of course, unbeknownst to Lippes, that whenever Lippes would deliver a Schorr note or notes to Murray for collection, Murray agreed to alert Schorr of such fact, and Schorr would then deliver cash to Murray to cover the face amount of the note(s). Such scheme circumvented the usual collection process, and no note, except for one hereinafter mentioned, was ever presented to a maker's bank for collection. Of course, had such presentment been effected initially and the uncollectable, forged note returned to Lippes in the regular course, Schorr's criminal scheme could have been aborted early.

It should be noted that such practice engaged in by Murray was a clear violation of subdivision (4) of section 3-504 of the Uniform Commercial Code, which mandates that "a note made payable at a bank in the United States *must* be presented at such bank." (Emphasis added.) Further, Murray's collaboration in this regard was also in direct violation of general banking practices and of rules adopted by his bank,

which were apparently predicated upon this Uniform Commercial Code section, as testified to by a vice-president of Atlantic Bank directly responsible for the operations of his bank's collection department and its staff, including its manager, Murray.

As Murray received a cash payment from Schorr, his practice was to complete and initial an intrabank credit slip known as a "290 ticket", which indicated that a cash payment had been received and was to be finally credited to Lippes' account. Murray would then deliver such slip and the cash to a teller in another bank department. Over the two- and a-half-year period, many such slips were so delivered and accepted without question by any bank personnel or officials. Neither the tellers, nor the Atlantic Bank vice-president in charge of the collection department, nor the bank's internal audit department, ever questioned the large number of such "290 tickets" and cash payments credited to Lippes' account, the acceptance of which was known and should have been known to be in violation of bank rules and the law.

During Murray's occasional absences from the bank, his assistant, following his instructions, accepted cash from Schorr to satisfy the Lippes notes, completed the "290" tickets and delivered them with the cash to the tellers in the same manner practiced by Murray. Neither Murray nor his assistant ever notified Lippes of this unauthorized and unusual cash redemption procedure. As testified, when one note slipped through accidentally and was presented for payment at a maker's bank, it was returned unsatisfied with notation "signature irregular". Murray's assistant notified Murray, not Lippes, of the default, and Murray communicated with Schorr, not Lippes, who then satisfied this note with the usual cash payment.

From the outset, Lippes apparently was led to believe that his notes were being paid through the formal and required collection procedure, and apparently was thus encouraged to continue his business relationship with Schorr. In all, about 1,000 notes were discounted, most apparent forgeries. However, in September, 1975, Schorr's scheme collapsed for reasons unclear in the record.[2] At that time, Lippes was left holding 603 forged notes with an aggregate face value of

---

2. The record appears to indicate that because of cash flow problems, Schorr was unable to cover the notes by cash payments, and at another point Murray testified, without further explanation, that he "couldn't accommodate him [Schorr] anymore".

$389,200, which the jury found cost Lippes $261,000 in discounted payment.[3]

Schorr, through his attorneys, and later personally, made and executed a full sworn confession to Lippes of his criminal scheme. Lippes commenced action against his bank, Atlantic Bank, its credit manager, Murray, Schorr and his wholly owned corporation, seeking, among other relief, compensatory damages of $389,000, the face amount of the remaining notes, with allegations couched in fraud, misrepresentation, negligence and violation of the Uniform Commercial Code. Schorr and his corporation defaulted and did not answer the complaint, resulting in a directed verdict against those defendants for the full amount of the loss; the other two defended.

The proof established the negligence of both Atlantic Bank and its collection manager, Murray, in processing the notes in an unorthodox and impermissible manner, and in contravention of the dictates of subdivision (4) of section 3-504 of the Uniform Commercial Code and bank rules, which statutory requirements and rules were known to and should have been known to at least all bank supervisory officials and department heads, including Murray. However, the jury exonerated Murray from blame, while holding Atlantic Bank partially liable for the loss to the extent of 5% thereof or $13,050, and, in effect, finding Lippes comparatively negligent to the extent of the remaining 95% of the loss.

The plaintiff agreed to and prosecuted his claim at trial against the bank and Murray essentially on the theory of negligence. However, defendants, without conceding their own negligence, elicited proof indicating Lippes' contributory negligence in failing properly to protect his investments, by, among other things, not verifying the genuineness of the notes directly with the makers thereof. The defendants maintain that had Lippes done so from the outset, Schorr's criminal scheme would have revealed itself, the relationship between them would have ended, and the damage avoided. Further, Schorr testified that he bribed Murray to engage in the scheme with him, while Murray firmly denied it, contending that he innocently collaborated under the misguided belief that Schorr and Lippes were associated as partners, as Schorr had al-

---

3. Lippes claimed he paid a discounted sum of $295,716. After discovery of the forgeries, many of the 603 notes were processed through formal bank channels but, of course, to no avail.

legedly told him, and that all he ever received from Schorr were token Christmas gifts and some jewelry.

As it relates to the bank's liability, and as suggested by *Fifth Ave. Bank v Forty-Second St. & Grand St. Ferry R. R. Co.* (137 NY 231, 241), the court charged the jury, in part, that the bank may, as a general rule, be liable to third parties (Lippes) for all manner of specified wrongful acts, including "tort, negligence and other omissions of duty of its employee agents in the course of said agents' employment even though the principal [bank] did not authorize or justify or participate in or indeed know of such misconduct, or even if it forbade the agents [acts] or disapproved of them"; and that the employee's knowledge or notice to him, while acting within his authority, is imputed notice or knowledge to the bank. Further, the court charged that the aforesaid general rule is subject to the "adverse agent" exception, in that knowledge or notice to the agent (Murray) is not chargeable to his bank when the agent deals with his principal "on account of an adverse party such as Schorr" in prosecuting some fraudulent or illegal enterprise which would be defeated if disclosed to the bank, and that if Murray was acting antagonistically to the bank in his dealings with Schorr, then the knowledge or notice gained by Murray cannot be imputed to the bank, his employer. *(Benedict v Arnoux,* 154 NY 715, 728-729; *Tree Plateau Co. v Mount Vernon Mills,* 22 AD2d 587, 590; *Reynolds v Snow,* 10 AD2d 101, 109, affd 8 NY2d 899.)

In the light of the contradictory testimony as to the receipt of bribes by Murray from Schorr, the jury could have found (but it did not) that Murray was acting primarily in his own interest, indifferent to the law and the bank rules, and in a manner adverse to the interest of his employer, to whom he did not reveal his unusual relationship with Schorr, and whom he subjected to a serious liability. Accordingly, we find no error in the charge as urged by plaintiff-appellant.

The jury apparently did not find Murray to be an adverse agent, but rather that he was acting negligently within the scope of his employment. Had the jury found Murray to be an adverse agent, it would have had to declare him liable to the plaintiff and to exonerate the bank. Rather, the jury completely exonerated Murray, resulting in a dismissal of the complaint against him with an award of costs in his favor. However, the verdict against the bank was announced by the foreman, as follows: "We, the jury, find for the plaintiff,

Lippes, against the defendant, Atlantic Bank, through the negligence of its agent, Rainer Murray."

■ The verdict is inconsistent and against the weight of the evidence and requires remand for a new trial. The evidence was clear as to Murray's negligence, and the jury so found. Accordingly, he was also liable to the plaintiff for damages. To find the employer liable for the negligence of its employee, but yet exonerate the employee co-tort-feasor, is not only inconsistent but incomprehensible under the facts of this case. (Cf. *Riviello v Waldron,* 47 NY2d 297.) Further, the direct negligence of the bank is similarly supported by the evidence (aside from the imputed negligence through Murray), in failing to establish and maintain for over two and a half years adequate supervisory controls to assure that its own rules and the law were not violated as, in fact, they were when Murray and his assistant accepted cash on a regular basis in payment for the notes.

One further contention of plaintiff-appellant is worthy of discussion and raises new questions relative to the comparative negligence doctrine. Since we remand for a new trial, the discussion may be of some guidance to the trial court. Plaintiff asserts that the trial court committed reversible error in charging the jury in accordance with the comparative negligence statute (CPLR 1411), in that the term "injury to property" as used there and judicially applied, does not relate to commercial transactions of the nature involved here, but was legislatively intended in its application to be limited to the classic personal injury negligence case, including malpractice, property damage and products liability, as pioneered and envisaged by *Dole v Dow Chem. Co.* (30 NY2d 143).

The CPLR provides as follows:

"§ 1411. Damages recoverable when contributory negligence or assumption of risk is established.

"In any action to recover damages for personal injury, injury to property, or wrongful death, the culpable conduct attributable to the claimant or to the decedent, including contributory negligence or assumption of risk, shall not bar recovery, but the amount of damages otherwise recoverable shall be diminished in the proportion which the culpable conduct attributable to the claimant or decedent bears to the culpable conduct which caused the damages."

The enactment of the above apportionment statute followed shortly after the adoption of CPLR 1401, which permits contri-

bution by two or more persons who may be liable for damages "for the same personal injury, injury to property or wrongful death". These statutes were intended to codify and clarify the rules enunciated and introduced into our law by *Dole v Dow Chem. Co. (supra;* 2A Weinstein-Korn-Miller, NY Civ Prac, p 14-2; Occhialino, Comparative Negligence, Special Six-Month Report of the Judicial Conference, State of New York, 1975, p 137).

*Dole* involved an action for wrongful death of plaintiff's husband, alleging therein that his death was caused by exposure to a poisonous chemical manufactured by Dow and used by the deceased's employer in fumigating grain storage bins. What the court intended by its decision was to "ameliorate an injustice" *(supra,* p 151) by declaring that a plaintiff's contributory negligence shall no longer constitute a complete bar to any recovery in a case footed in negligence, but rather, the "[r]ight to apportionment of liability * * * as among parties involved together in causing damage by negligence, should rest on relative responsibility and to be determined on the facts." *(Supra,* p 153.) As stated in *Codling v Paglia* (32 NY2d 330, 346), "fundamental fairness does not require an all-or-nothing rule which exonerates a very negligent defendant for even the slightest fault of his victim." Surely, the logic underlying the *Dole* rules and the rules themselves were expressed in generic terms to apply not only to the facts in *Dole,* but to all manner of tort liability of every description to which apportionment of damages may be readily applied without doing violence to substantial interests. We find no distinction in logic or *Dole,* which limits application of the rules merely to "accident" cases to the exclusion of all other causes pursued under a theory of tort liability. To exclude apportionment of damages in a tort action arising from commercial relationships and to insist that contributory negligence remain a bar to any recovery in such cases, would perpetuate the injustice *Dole* addresses and deny the ameliorative effect established by it and its progeny. It is "pragmatically sound, as well as realistically fair" to permit apportionment among "joint or concurrent tort-feasors regardless of the degree or *nature* of the concurring fault." *(Kelly v Long Is. Light. Co.,* 31 NY2d 25, 29 [emphasis added].)

The late Judge KEATING declared that: "The policy of modern tort law has been to expand tort liability 'in the just effort to afford decent compensatory measure to those injured by the

wrongful conduct of others' ". *(Millington v Southeastern Elevator Co.,* 22 NY2d 498, 507; cf. *Underpinning & Foundation Constructors v Chase Manhattan Bank, N.A.,* 46 NY2d 459.) If the legal principles enunciated by *Dole* are to remain viable, it should meet the necessary and reasonable needs in commerce and elsewhere, and "should be subject to the dynamics of appropriate growth and refinement" *(Alvez .v American Export Lines,* 46 NY2d 634, 644), permitting of a flexible and purposeful application to redress civil wrongs in all manner of tort causes. Accordingly, *Dole* suggests solutions, as here, for different problems in a continuously changing context. For example, *Dole* has been extended to strict liability, breach of warranty cases, which find their essential genesis in contract law *(Mendel v Pittsburgh Plate Glass Co.,* 25 NY2d 340, 343) rather than negligence law. (McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR 1411:1, p 386; *Hughes v Ataka Amer.,* 48 AD2d 808; *Noble v Desco Shoe Corp.,* 41 AD2d 908; *Walsh v Ford Motor Co.,* 70 Misc 2d 1031; see *Codling v Paglia, supra,* pp 344-345.)[4] It has been further extended to bailment cases bottomed in negligence *(Mannis v Pine Hills Taxi Co.,* 87 Misc 2d 680; *Ujueta v Park Swift Parking Corp.,* NYLJ, May 31, 1979, p 12, col 2).

Further, the use of the term "culpable conduct" in CPLR 1411, rather than "negligent conduct", presents further support to the view that the legislative intent was to release the concept of damage apportionment from the parochial confines of accident cases and to broaden its application flexibly "to reach any breach of legal duty or fault by the defendant, including *but not limited to* negligence in any degree, breach of warranty, strict liability and violation of a statutory duty."[5] (Homburger, The 1975 New York Judicial Conference Package: 25 Buffalo L Rev 415, 434; emphasis added.) "Judicial development of the concept of 'culpable conduct' consistent with the goal of this article [CPLR art 14-A] is not precluded." (Occhialino, Comparative Negligence, Special 6-Month Report of the Judicial Conference, State of New York, 1975, pp 139-

---

4. Although a breach of warranty is a violation of a sales contract out of which the warranty arises, it also represents a tortious wrong suable by a noncontracting party. *(Goldberg v Kollsman Instrument Corp.,* 12 NY2d 432, 436.)

5. "Nowhere is it required that the liability be predicated upon negligence" in order to apply an equitable apportionment of damages under CPLR article 14. *(Doundoulakis v Town of Hempstead,* 42 NY2d 440, 451.) It was alleged and proved that defendants here violated a statutory duty, namely, that provided in subdivision (4) of section 3-504 of the Uniform Commercial Code.

140; 2A Weinstein-Korn-Miller, NY Civ Prac, par 1411.04.) Harms specifically not mentioned in the act can be included "if court determines the common law of the state would make the application". (Schwartz, Comparative Negligence, § 2.3, p 38; § 21.4, p 130.) Accordingly, one commentator suggests that our "comparative negligence" law be renamed generically as the "comparative fault" law. (Krause, Comparative Negligence in New York, 47 NYSBJ 638, 639.)[6]

What is the intended meaning of the term "injury to property" in CPLR 1401 and 1411? Was it the intent to restrict its application only to, and does it represent a synonym for, "property damage", as apparently urged by appellant? He further argues that the term has never been applied to a commercial case, "even remotely similar to the one at bar" and, therefore, has no application here. The argument finds seeming support in the 1975 Report of the Judicial Conference, State of New York (p 218), wherein it is stated that "no substantive change is intended" when CPLR 1401 was amended in 1974 to change the term "property damage", previously appearing therein, to "injury to property". However, that observation seems to overlook the variant, statutory meaning of the term in the General Construction Law, hereinafter discussed.

The history of the term "injury to property" in this State belies the contention for such narrow construction, in that it encompasses a much broader meaning than that ascribed to it by the Judicial Conference. It covers a host of torts other than those merely involving physical injury to property. It is to be assumed that the Legislature was familiar with, had knowledge of and gave expression to that history. It did not act in a vacuum "without regard to the pooled general knowledge of the legislators themselves" (McKinney's Cons Laws of NY, Book 1, Statutes, § 91, p 176). Although it may well be that the comparative negligence doctrine, and particularly the term "injury to property" has not been applied to a fact situation similar to that here, we are not constrained, in the exercise of common sense, to avoid such application in cases, as here, which fall within the purview and scope of its clearly comprehensive ambit. In the final analysis, we believe, its application here is logical and presents a just result within

6. The phrase, *culpable conduct* "is meant to cover all conduct by the plaintiff, negligent or otherwise, that may be considered in diminishing recovery." (Farrell, Civil Practice, 27 Syracuse L Rev 425, 438.)

the "general spirit and underlying purpose" of CPLR 1401 and 1411 (McKinney's Cons Laws of NY, Book 1, Statutes, §§ 93, 96).

"Injury to property, however, need not be limited to a direct corporeal damage or wrong done to the specific property, as distinguished from an infringement of the rights of property; but is sometimes to be given a broad and unrestricted meaning, so as to include every invasion of one's property rights by actionable wrong" (43A CJS, Injury, pp 771-772).

In *Reiter v Sonotone Corp.* (— US —, 47 USLW 4672, 4674), a unanimous court declared that "the word 'property' has a naturally broad and inclusive meaning. In its dictionary definitions and in common usage 'property' comprehends anything of material value or possessed." In another context, property has been defined to include "thing[s] in action, evidence of debt * * * [a] thing of value". (Penal Law, § 155.00, subd 1.) The value of the promissory notes having been lost to the plaintiff, he was deprived of his property.

The term "injury to property" is an ancient concept in our law. Subdivision 10 of section 3343 of the 1876 Code of Civil Procedure, derived from subdivision 3 of section 176 and sections 462, 463 and 464 of the 1848 Code of Procedure (see *Cleveland v Barrows*, 59 Barb 364) provided that: "An 'injury to property' is an actionable act, whereby the estate of another is lessened, other than a personal injury or the breach of contract." This statutory definition has been perpetuated in that precise form in section 490 of the Justice Court Act (McKinney's Cons Laws of NY, Book 29A, Part 2, repealed Sept. 1, 1967 by L 1966, ch 898), and since 1920 in our General Construction Law, where it now resides as section 25-b (formerly § 25-a, as renum by L 1952, ch 821, § 5).[7]

Although it was long ago argued, as the appellant apparently does here, that the term *injury to property* "included only some physical injury to tangible property * * * It is plain from the definition that the expression 'injury to property' * * * is to be given a broad and unrestricted meaning, so as to include every invasion of one's property rights by actionable

---

7. The term is also used in CPLR 214 (subd 4) providing for a three-year Statute of Limitations in actions to recover damages for "injury to property". CPLR 213 (subd 7) provides that action for "injury to property" of a corporation brought against directors and officers be commenced within six years. CPLR 4533-b provides that the fact of prior payment or settlement in actions for "injury to property" be kept from jury. It had also been used in subdivision 3 of section 826 of the Civil Practice Act.

wrong, and the decisions in this State have quite uniformly construed the expression in this manner [cases cited]". *(Ghiglione v Friedman,* 115 App Div 606, 607; *Buckley v Mayor etc. of City of New York,* 30 App Div 463, 466, affd 159 NY 558; *Jay Bee Apparel Stores v 563-565 Main St. Realty Corp.,* 130 Misc 23, 27, affd 226 App Div 721; see, also, *McIntyre v Kavanaugh,* 242 US 138, 141.) An action based upon an alleged injury to property is one sounding in tort. *(Platt Corp. v Platt,* 42 Misc 2d 640, 643, affd 23 AD2d 823, revd on other grounds, 17 NY2d 234; *Polo v Kibrick,* 120 NYS2d 49, 51; *Side v Thompson,* 205 NYS2d 240.) Accordingly, any manner of commercial torts have been found to be within the purview of "injury to property".[8] In *Reiter v Sonotone Corp.* (— US —, 47 USLW 4672, 4674, *supra),* the United States Supreme Court held that a purchaser of hearing aids, who had to pay an "artificially inflated" price because of a manufacturer's anticompetitive practices "is injured in 'property'", as contemplated by section 4 of the Clayton Act (US Code, tit 15, § 15). That provision authorizes an action by: "Any person who shall be injured in his * * * property by reason of anything forbidden in the antitrust laws". A conversion has been held to be an injury to property *(Kavanaugh v McIntyre,* 74 Misc 222, 226, affd 151 App Div 910, affd 210 NY 175, affd 242 US 138, *supra);* and thus governed by the three-year Statute of Limitations *(Mintzer v Windsor Lamp Mfg. Co.,* 175 Misc 551, 552; *Bernstein v N. V. Nederlandsche-Amerikaansche, Stoomvaart-Maatschappij,* 76 F Supp 335, 344, mod on other grounds, 173 F2d 71).

Other injury to property situations are: an action against corporate directors, alleging injury to corporate assets by waste, neglect and mismanagement in failing to attend directors' meetings and to properly supervise corporate affairs *(Platt Corp. v Platt, supra);* an action by a judgment debtor of an insolvent corporation against its directors for making illegal transfers of corporate property *(Trustees of Masonic Hall & Asylum Fund v Fontana,* 99 Misc 497, 500); for inducing a breach of contract *(Polo v Kibrick, supra; Side v*

---

8. "In Hilliard on Torts (Vol. 1 [3rd ed.], p. 464) it is said: 'Injuries to property are in themselves of great variety; being committed with or without force, immediately or consequentially, by misfeasance or nonfeasance, by direct invasion of another's possession, or by an unauthorized use of one's own property, causing damage to another. With reference to the injuries themselves, they include disseisin, trespass, nuisance, conversion, waste, fraud and negligence' ". *(Kavanaugh v McIntyre,* 210 NY 175, 180, affd 242 US 138, *supra.)*

*Thompson, supra;* Prosser, Law of Torts [4th ed], § 129, pp 930-931); and improperly filing a mechanic's lien upon a fictitious claim resulting in delaying building work *(Ghiglione v Friedman, supra).*[9]

What becomes apparent from a reading of the cases is that any tortious act (other than personal injury) resulting in damage (i.e., "whereby the estate of another is lessened"; General Construction Law, § 25-b) constitutes an "injury to property" within the contemplation of CPLR 1401 and 1411. Given that logically broadened meaning, the "culpable conduct" of the defendants here resulted in an injury to plaintiff's property and justified an appropriate application of damage apportionment between the parties.

We have examined the other issues raised and find them without merit.

Accordingly, the judgment, Supreme Court, New York County, (MERTENS, J.) entered April 10, 1978, should be unanimously reversed, on the law and the facts, insofar as appealed from and the matter remanded for a new trial, with costs and disbursements to abide the event.

BIRNS, SULLIVAN, LUPIANO and SILVERMAN, JJ., concur.

Judgment, Supreme Court, New York County, entered on April 10, 1978, reversed, on the law and the facts, insofar as appealed from, and the matter remanded for a new trial, with $75 costs and disbursements of this appeal to abide the event.

---

9. There is agreement elsewhere. For example, loss resulting from negligent failure to increase insurance represents "injury to property". *(Darnell Photographs v Great Amer. Ins. Co.,* 33 Colo App 256); as does an action for fraud and deceit or malicious attachment *(Guggisberg v Boettger,* 139 Minn 226), or an action for funeral expenses by an administratrix against alleged tort-feasor who caused decedent's death *(Adams v Malik,* 106 Ohip App 461).