**TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, Plaintiff,**

v.

**COAXIAL COMMUNICATIONS OF CENTRAL OHIO, INC., Defendant.**

**No. 88 Civ. 1073 (VLB).**

United States District Court, S.D. New York.

July 25, 1992.

---

Sheldon Oliensis, Kaye, Scholer, Fierman, Clifford S. Haye, Sr. Counsel, Teachers Ins. & Annuity Assn., New York City, for plaintiff.

David N. Ellenhorn, Roanne Mann, Stein, Zauderer, Ellenhorn, New York City, for defendant.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

This is the most recent in a series of cases in this court concerning agreements

by and between a lender and a borrower to loan and to borrow certain monies under general terms as set forth in a commitment letter to be elaborated more fully through subsequent negotiations. See *Teachers Ins. & Annuity Ass'n v. Walter Kidde & Company, Inc.*, No. 76–5128, slip op. at 4 (S.D.N.Y. July 28, 1978); *Teachers Ins. & Annuity Ass'n v. Butler*, 626 F.Supp. 1229 (S.D.N.Y.1986); *Teachers Ins. & Annuity Ass'n v. Tribune*, 670 F.Supp. 491 (S.D.N.Y.1987); *Teachers Ins. & Annuity Ass'n v. Ormesa Geothermal*, 791 F.Supp. 401 (S.D.N.Y.1991).

■ In the case at hand, the commitment letter states expressly that the agreement to lend and to borrow $55,000,000 on terms partially but not entirely set forth in the letter is binding: "Upon receipt by TIAA of an accepted counterpart of this letter, our agreement to purchase from you and your agreement to issue, sell and deliver to us, or at our request to our wholly-owned subsidiary, the captioned securities, shall become a binding agreement between us."

The commitment letter constitutes an agreement which binds both parties. Both parties were sophisticated business entities operating with advice of counsel. Lack of understanding of the provisions set forth in the commitment letter by equally knowledgeable parties is neither plausible nor claimed. See generally *Northwestern National Insurance Co. v. Donovan*, 916 F.2d 372 (7th Cir.1990).

The purpose of this memorandum order is to advise the parties concerning some aspects of the charge to be given to the jury and concerning arguments which can be made in the parties' summations to the jury.

## I

■ As noted above, based on the quoted unequivocal language and the mutual assent of both parties to such terms as set forth in the letter, the commitment letter in this case constitutes a bilaterally binding agreement. Since the commitment letter provides for no prepayments during the first five years, defendant may not argue to the jury that insistence on a five-year prepayment ban (no-call provision) is unreasonable or contrary to common industry practice. Nor may defendant argue that the post-five year prepayment premium set forth in the commitment letter is unreasonable or contrary to industry practice. Moreover, I will instruct the jury that TIAA was not required to modify the commitment letter provisions in the subsequent negotiations.

Given the inherent risks to both parties involved in large, long-term non-prepayable financial transactions, it may well be that industry practice suggests a recognition that provisions for such so-called call protection are unwise from the perspective of a borrowing entity. Conversely, from the point of view of the lender, it may be better business practice to preserve a degree of flexibility rather than to insist upon adherence to rigid no-call provisions. A transaction seemingly secure at the time it is entered into may in fact turn out to be hazardous. Where a borrower retains lent funds involuntarily, risks may be especially great, since the lender may face the very real possibility that an unwilling borrower may be unable to repay the loan or may engage in complex corporate transactions giving rise to a risk of invocation of non-insolvency bankruptcy under Chapter 11 of the Bankruptcy Code.

However, absent a clear violation of public policy it is important to preserve the freedom of parties to contract. It is not for a fact-finder to second-guess the wisdom of their choices. Both parties elected to sign the commitment letter as written despite the risks, and defendant cannot now be heard to seek to avoid its contract because of regrets on its side about a strategic business decision.

## II

■ One of the contested issues in this case is the proper theory on which to calculate any damages. I find that the appropriate measure of damages is set forth in Judge Kimba Wood's decision in *Teachers Ins. & Annuity Ass'n v. Ormesa Geothermal*, 791 F.Supp. at 415 (S.D.N.Y.):

TIAA is thus entitled to damages equal to the discounted present value of the incremental interest income TIAA would be expected to lose as a result of the breach. Specifically, the lost interest income is measured as the difference between (a) the interest income TIAA would have earned had the contract been performed, and (b) the interest income TIAA would be deemed to have earned by timely mitigating its damages—i.e., by making an investment with similar characteristics at the time of the breach. The critical aspect of this damage calculation is that the substitute investment have similar characteristics, measured by the factors listed by Judge Wood or their surrogate, the interest rate set for a comparable bond by the marketplace.

■ TIAA will not be permitted to argue to the jury that contractual negotiations about the implementation of the commitment letter which did not lead to agreement may be used to suggest that the parties regard some other measure of damages as appropriate. There is no agreement, ambiguous or otherwise, to be interpreted subsequent to the commitment letter. To permit preliminary, tentative or unilateral positions to be used against either party as establishing concepts to be imposed on that party would be inappropriate.

■ Post-commitment letter discussions and proposals and reactions to them are, of course, important in suggesting the presence or absence of good faith negotiation towards implementing the commitment letter. See Farnsworth, *Pre-Contractual Liability and Preliminary Agreements, Fair Dealing and Failed Negotiations*, 87 C L Rev 217 (1987), *Skycom Corporation v. Telstar Corporation*, 813 F.2d 810 (7th Cir.1987).

■ However, positions taken solely for the purpose of negotiations cannot be treated as evidence of what ought to be done absent agreement, without exerting a chilling effect on contractual negotiations. Use as evidence for that purpose of tentative positions offered solely for bargaining purposes and subject to amendment for return concessions expected from the other side would be dangerous, thus chilling free exchanges of tentative views on possible accommodations and increasing the difficulty in contracting. The party able to have its demands tentatively accepted first would enjoy an advantage tending to make disputes over the order of issues discussed of critical importance and enhancing the importance of agenda manipulation. See Gordon, *Shareholder Initiative: A Social Choice and Game Theoretic Approach to Corporate Law*, 60 U.Cin.L.Rev. 347 (Fall 1991); Rose–Ackerman, *Winning the Context by Agenda Manipulation*, 2 Policy Analysis & Management 123 (1982); Levine & Plott, *Agenda Influence and Its Implications*, 63 Va.L.Rev. No. 7, at 561 (Nov. 1977).

### III

■ Terminology used in connection with an agreement cannot be carried over to the realm of damage computation. Thus a prepayment premium provided for in the commitment letter may be larger or smaller than that needed to make a creditor whole for loss of a high-interest yielding instrument at a time when rates are lower. The premium was bargained for as part of a package containing other elements. The use of such terms as "make whole" in discussion of such premiums does not indicate whether those premiums would more than make whole the creditor, would less than make whole the creditor, or would precisely make whole the creditor under all the circumstances. Where, but only where, such a provision was agreed to as a liquidated damages provision under circumstances that are applicable, and where it is reasonable for that purpose (i.e. does not represent a penalty) would such a provision be a proper means of calculating damages.

### IV

During prior conferences, I have indicated that allocation of responsibility based on any concurrent causation of failure to implement the binding agreement between the parties may be a further aspect of

damage computation, and the parties have submitted briefs on this subject.

■ I agree with TIAA that a breach of contract by one party, not excused by a prior sufficiently material breach by the other, cannot be mitigated by a concept of comparative fault borrowed from tort law. Thus I will instruct the jury to determine initially whether (a) Coaxial, or (b) TIAA, by abandoning the effort to negotiate in good faith on terms to implement the commitment letter, first prevented the commitment letter from ripening into an actual transaction.

■ If, however, the jury finds that neither party first prevented the commitment letter from ripening into an actual transaction, because both acted simultaneously in a process of mutual disengagement—for example by escalating hostility simultaneously through raising the ante each time the other provided an excuse to do so—the parties will share responsibility for failure to consummate the loan agreed upon. Shared responsibility for such intentional behavior is consistent with New York law. The courts of New York traditionally insure that the purposes of legal concepts are fulfilled by tailoring their application to the facts at hand, provided that predictability is not sacrificed. See especially *Tedla v. Ellman*, 280 N.Y. 124, 19 N.E.2d 987 (1939). New York law specifically recognizes that what might be termed cliffs of liability shifting from 0% responsibility to 100% at a razor's edge are inappropriate where both parties are substantially responsible for a result. See CPLR 1411, broadly construed in, e.g., *Arbegast v. Board of Education*, 65 N.Y.2d 161, 490 N.Y.S.2d 751, 480 N.E.2d 365 (1985); *Lippes v. Atlantic Bank of New York*, 69 A.D.2d 127, 419 N.Y.S.2d 505 (1st Dept. 1979); McLaughlin, Practice Commentary to § 1411 at 386 (McKinney's 1976).

It is, of course, important to distinguish between the concept of concurrent responsibility where good faith negotiations are required to implement a contract, and the distinct concept of comparative fault in tort cases. The latter involves negligence, whereas the contract concept, in addition to being articulated in entirely different terms, involves intentional conduct by the party claiming breach which may contribute to that breach or damages caused by the breach. This concept has been articulated in the field of public contract law. James, *Concurrency and Apportioning Liability and Damages in Public Contract Adjudications*, 20 Public Contract L.J. No. 4, at 495 (ABA Summer 1991).

The concept of concurrent responsibility is supported by several cases ruling that concurrent responsibility may be used to apportion damages where intentional conduct is involved. *Dynalectron Corp. (Pacific Division) v. United States*, 518 F.2d 594, 603, 207 Ct.Cl. 349 (1975); *Grumman Aerospace Corp. v. United States*, 549 F.2d 767, 774–75 (Ct.Cl.1977); E.H. Marhoefer, Jr. Co., DOTCAB No. 70–17, 71–1 BCA 8791; *Dale Constr. Co. v. United States*, 168 Ct.Cl. 692 (1964); *Hilltop Electric Const. Co.*, DOTCAB 78–6, 78–2 BCA 13,421. In these cases the cost created by the delay was apportioned between the parties in proportion to their respective responsibilities.

Background for this approach can be found in the increasing recognition that the calibration of legal consequences rather than simplistic liable-or-not-liable characterization is appropriate. As long ago as 1899, Justice Holmes criticized the archaic notion that conduct must fit into a rigid two-valve grid limited to the options of 100% or 0%. Holmes, *Law in Science–Science in Law*, 12 Harv.L.Rev. 433 (1899), also in Holmes, *Collected Legal Papers*, pp. 210–243 (1921). More recently, in *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 1715, 44 L.Ed.2d 251 (1975), the Supreme Court overturned a longstanding precedent in admiralty law to adopt an apportionment approach to collision damages. In that case Justice Stewart held that the admiralty rule of equally divided damages should be replaced by one apportioning liability for damages in proportion to each party's fault.

Limiting the jury to an all-or-nothing choice if the facts do not fit that model

would involve what has been described as the trap of "delusive exactness," Holmes, J. dissenting in *Truax v. Corrigan*, 257 U.S. 312, 342–43, 42 S.Ct. 124, 133, 66 L.Ed. 254 (1921). It would likewise ignore the reality that a complex series of events must sometimes be perceived as a whole when it is not found workable by the fact-finder to break them down into discrete independent events. This error is sometimes known as "disaggregation," see Tushnet, "Book Review," 82 Colum.L.Rev. 1531, 1536–39 (1982); see *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707, 82 S.Ct. 1404, 1415, 8 L.Ed.2d 777 (1962); *Direct Sales Co. v. United States*, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943).

Shared responsibility for events is, indeed, a generally recognized concept in the legal system whenever the factual situation calls for its invocation. See *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126, 108 S.Ct. 915, 925, 99 L.Ed.2d 107 (1988) (O'Connor, J.) ("We are also aware that there will be cases in which policymaking responsibility is shared among more than one official or body.").

In this case it would seem logical that if the jury finds that rather than one side breaching the contract first, both parties agreed to negotiate in good faith towards the implementation of a binding agreement and both of the parties failed to do so, the concept of concurrent responsibility should be applied. The situation would then be one in which each party "regards [effective or announced] withdrawal by the other ... as unjustified," Knapp, "Enforcing the Contract to Bargain," 44 N.Y.U.L.Rev. 673, 685–86 (1969). If both sides acted unreasonably at the same time and the jury cannot determine which one spoiled the situation first, "the situation is possible of each of the two parties having a right of specific performance against the other," and in that event, "it is not possible that each shall have a right to damages for total breach of contract," 6 S. Williston, *Contracts* § 832 (3d ed. 1962), quoted in 2 Farnsworth, *Farnsworth on Contracts* 440 n. 21 (1990).

Overall damages should in such an event then be apportioned in proportion to each party's responsibility for the breakdown of good faith negotiations.

SO ORDERED.