**FOUR POINTS SHIPPING AND TRADING, INC., Plaintiff,**

v.

**POLORON ISRAEL, L.P. and TMT Homes, Inc., Defendants.**

**No. 92 Civ. 2294 (VLB).**

United States District Court, S.D. New York.

March 22, 1994.

procedure for seeking administrative review, need not be reached for purposes of this ruling.

Richard C. Goldberg and Steven Orel, Le-Boeuf, Lamb, Leiby & MacRae, New York City, for defendants.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I

This litigation grows out of cancellation of an intended shipment of parts for prefabricated housing to be manufactured in the United States and shipped to Israel on a vessel to be chartered by plaintiff Four Points Shipping and Trading, Inc. ("Four Points"). The contract between Four Points and the intended shipper, defendant Poloron Israel, L.P. ("Poloron"), was entered into on May 6, 1991 (the "Poloron–Four Points contract").

■ The Poloron–Four Points contract states that it shall "be governed by the Maritime Law of the United States and the laws of the State of New York." Admiralty jurisdiction is available where the subject matter of the contract is ocean carriage, since such jurisdiction is "designed to protect maritime commerce." *Exxon v. Central Gulf Lines,* 500 U.S. 603, 611, 111 S.Ct. 2071, 2076, 114 L.Ed.2d 649 (1991); see *Sirius Ins. Co. v. Collins,* Slip Op. 1553, Dkt. No. 93–7761 (2d Cir. Feb. 4, 1994); *Robert E. Derecktor, Inc. v. Norkin,* 820 F.Supp. 791 (S.D.N.Y.1993). The principles applicable to the current dispute appear to be the same under both maritime and New York law.

### II

The facts described below, except where a controversy is mentioned, are undisputed. Both sides contend that there are no genuine issues of material fact. Both have cross-moved for summary judgment under Fed. R.Civ.P. 56 as to liability.

Four Points seeks profits lost by virtue of the failure of the shipment to proceed as well as out-of-pocket expenses; defendants contain they have no liability. While Four Points' request for out-of-pocket costs may have merit, its claim for lost profits cannot be

Gregory J. Ligelis and David J. Burke, Robinson & Cole, New York City, for plaintiff.

sustained for several reasons, discussed in greater detail below:

(a) The parties agreed on a rider to the Poloron–Four Points contract signed the same day as that contract, making the contract "effective" only when a contract between Poloron and Poloron Homes of Pennsylvania, Inc. (the "manufacturer") was "effective." This provision pointedly avoids making the Poloron–Four Points agreement operational when the manufacturing contract was *signed.* Because Poloron's agreement with the manufacturer was signed the same day, the use of the term "effective" makes sense only if effectiveness meant an initially contingent and never-achieved actual ability to produce the product to be shipped.[1]

(b) The Poloron–Four Points contract specifically exculpates either party from claims for damages due to "delays of manufacturers" beyond the control of the breaching party.

(c) Knowing that the manufacturer's performance was essential to the transaction, Four Points was in as good a position as Poloron to insist on full and satisfactory financial information about the manufacturer before signing its contract with Poloron. Not having done so, Four Points cannot place the burden on Poloron of the consequences of the manufacturer's failure to perform to the detriment of all three entities. Four Points' interpretation of its agreement with Poloron calls for it to be construed as placing all of the risk on Poloron if the manufacturer should fail to produce the product to be shipped, even though Four Points had for its part incurred no fixed commitments at all. This implausible construction not set forth in the contract is not supported by any written or oral evidence that it was intended.[2]

(d) Because Four Points never signed a vessel purchase or charter agreement in connection with the projected Poloron shipment, any effort to determine whether or not Four Points lost any profits and if so in what amount would be speculative.

Defendants' motion for summary judgment is granted except as to liability for out-of-pocket expenses incurred by Four Points should it be established upon further submissions that Four Points was misled by Poloron concerning the extent of risks that the transaction might be aborted.[3] Four Points' motion is denied, without prejudice to renewal as to a claim for out-of-pocket expenses as mentioned above.

### III

Four Points owned no vessels and never chartered any, but claims it could have undertaken other transactions had it not pursued the one at issue here. Four Points did, however, incur expenses in investigating the transaction and canvassing possibilities for carriage of the freight.

The Four Points–Poloron contract provides:

> In case any performance under the Contract shall be prevented or delayed by reason of ... delays of manufacturers plants ... or ... any other cause not within the control of the party whose performance is delayed or prevented and which by the exercise it is unable to prevent ... no liability for damage or delay shall arise against said party on account of failure delay due thereto.

The Poloron–Four Points contract was signed on the same day, May 6, 1991, as a separate agreement between Poloron and the manufacturer, calling for production of the prefabricated housing parts to be shipped to Israel. A rider to the Poloron–Four Points contract, also signed on May 6, 1991, provides that the Poloron–Four Points contract "shall not become effective unless and until

---

1. Despite the overlapping names of these two entities, Four Points does not contend, and has produced no evidence to indicate, that the companies sharing the Poloron name were under common control or had common ownership.

2. See *Matsushita Electric Industrial Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

3. Four Points had submitted no factual basis for a separate independent claim against the co-defendant TMT Homes, Inc. apart from its claim against Poloron. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

the Agreement between Poloron Israel, L.P. and Poloron Homes of PA. Inc. [sic] dated May 6th, 1991 becomes effective."

Because of financial difficulties and possibly because of diminished interest in Israel in importing prefabricated housing, the manufacturer did not produce the parts which were to have been shipped. It is not disputed that the cancellation of the entire transaction was financially harmful to all participants. Plaintiff has produced no evidence that defendants could have avoided the problems encountered by the manufacturer, but argues that such problems were foreseeable by defendants when the contract was entered into.

## IV

■ The rider to the Poloron–Four Points contract quoted above was signed on the same day as the agreement between Poloron and the manufacturer to which the rider refers. The parties' choice of the term "effective" rather than the more common and obvious one of "signed" should be given some significance.

Moreover, the ordinary meaning of "effective" connotes actual ability to achieve a result. Webster's *Third New International Dictionary* (1971) at 724 contains half of a full column of fine print setting forth meanings of "effective" and its synonyms, treated as "effectual, efficient, efficacious." None of the definitions refer to a formal signature of a document or other first stage initiatory action. The first definition begins by referring to "bring about, accomplish." Other typical definitions on the same page include "capable of having its normal effect: able to function normally ... marked by the quality of being influential or exerting positive influence: exerting authority: carrying weight ... capable of being used for a purpose ... ACTUAL ..." (capitalization in the original).

Where an event involving documentation is involved, the term "effective" is used to refer to the time of implementation, not signature. Usage No 6 ("taking effect"), while containing both VALID and OPERATIVE as synonyms, conveys its central meaning in the following examples:

the following resignations were accepted [*effective*] during the academic year under review ... the order was [*effective*] as of June 7 ...

The ordinary meaning of the word used by the parties is thus connected with implementation rather than initial authorization of an action.

Judicial interpretation of "effective" parallels dictionary definitions. When not used as indicating meaningfulness and practical impact, the word connotes actual implementation rather than merely written or oral authorization or initiation of an action. For example, the Second Circuit used the term as follows in *Arango–Aradondo v. INS*, 13 F.3d 610, 612 (2d Cir.1994):

We need not address [an argument] in light of a recent amendment to Rule 25(a) of the Federal Rules of Appellate procedure which became effective while this appeal was *sub judice.*

Similarly, in *United States v. Harris*, 13 F.3d 555, 558–59 (2d Cir.1994) the Court referred to having decided a precedential case "after the 1992 amendments [to the relevant provision] became effective." See, in the same vein, e.g., *Manning v. Energy Conversion Devices*, 13 F.3d 606, 608 (2d Cir.1994) (absent a release by a party under the circumstances of the case, releases by others "are not effective."); *Bax v. CIR*, 13 F.3d 54, 55 (2d Cir.1993) (a stipulation was "effective upon the entry of [a court] decision").

The parties' choice of the term "becomes effective" as contrasted with "signed" in the Poloron–Four Points rider has practical meaning only as referring to the time when manufacturing of the material to be shipped has been completed, is reasonably certain to be completed, or at the very least has begun. Otherwise the selection of "effective" rather than "signed" serves no purpose, an assumption courts are reluctant to make. *Sea Robin Pipeline v. FERC*, 795 F.2d 182, 184 n. 1 (D.C.Cir.1986) (R. Ginsburg, J.). A document's use of language, such as divergence from otherwise customary language ordinarily used, cannot properly be assumed to be without significance. See *Ohio Power Co. v. FERC*, 880 F.2d 1400, 1406 (D.C.Cir.), *re-*

*hearing en banc denied* 897 F.2d 540 (D.C.Cir.1989), *rev'd on other grounds* 498 U.S. 73, 111 S.Ct. 415, 112 L.Ed.2d 374 (1990). Such an assumption is particularly inappropriate concerning documents prepared by equally sophisticated parties negotiating at arm's length. See *Lone Star Industries v. Nelstad Material Corp.*, 811 F.Supp. 147 (S.D.N.Y.1993).

Such an assumption also makes no practical sense where both the manufacturing contract and the Poloron–Four Points agreement were signed on May 6, 1991, to treat the virtually simultaneous *signature* of the Poloron—manufacturer contract as the event necessity for the Poloron–Four Points agreement to become effective. Were that the case, the rider clause would have no practical meaning. It is clearly implausible that a special rider executed on the same day as the Poloron–Four Points agreement would contain a key clause governing the effectiveness of the Poloron–Four Points agreement under circumstances such that this clause would have no usefulness to either party and no effect.

Treating the term "effective" as synonymous with "signed" would serve a purpose only if a High Noon negotiation was being carried down to the last minute so that it mattered who signed which document first. No such supposition has even been hinted at by any of the parties. Any other construction would be both "implausible" and not supported by "more persuasive evidence ... than would otherwise be necessary." *Matsushita Electric Industrial Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). No such evidence, written or·oral, has been provided.

Thus the term "effective" in the rider should be treated as referring to a time when the manufacturer had completed the work, was reasonably certain to be able to do so, or at the very least had begun it. Four Points has submitted no evidence that such a stage was ever reached, so as to activate the Poloron–Four Points agreement. Absent such evidence, its contract claim must fail. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

V

■ Four Points' claim for damages for lost opportunities also runs afoul of the clause in the Poloron–Four Points contract protecting either party from liability to the other if performance is prevented because of "delays of manufacturers plants ... not within control of the control of the party whose performance is delayed ..." It is undisputed that such·a delay occurred. Four Points has furnished no evidence that the delay was within Poloron's control. Four Points argues that Poloron could have looked elsewhere for a·manufacturer, but furnishes no evidence that this would have produced a sufficiently similar product within the time necessary or on terms that would be workable.

For purposes of this motion, it is assumed that Poloron was or should have been aware of risks that the manufacturer might be unable or unwilling to proceed. Without a specific contract provision, such unforeseeability of the full extent of the risk on the part of Poloron would be a precondition for excusing nonperformance because of impracticability under the underlying doctrine of impossibility of performance, or under a *force majeure* clause which was silent on allocation of the specific risk at issue. See *Harriscom Svenska v. Harris Corp.*, 3 F.3d 576, 578–580 (2d Cir.1993); *Asphalt International v. Enterprise Shipping*, 667 F.2d 261, 265 (2d Cir. 1981); *Kel Kim Corp. v. Central Markets*, 70 N.Y.2d 900, 524 N.Y.S.2d 384, 519 N.E.2d 295 (1987).

The above and all other authorities are in agreement, however, that the parties may provide as they wish with regard to how risks are divided. Absence of awareness of risk is not a precondition for exculpation under the quoted provision of the Poloron–Four Points contract. Instead, the provision conditions exculpation on absence of *control* of the contingency—which there is no evidence that defendants possessed. See Berman, "Excuse for Nonperformance in the Light of Contract Practices in International Trade," 63 Colum.L.Rev. 1413, 1423 (1963).

VI

Even were both documents signed by Poloron and Four Points less explicit, the rela-

tionship between the parties would suggest, absent contrary language, that each would reap its own profits or incur its own losses were the transaction aborted prior to any commitments by Four Points binding it to pay for a vessel it purchased or chartered. Four Points, an entity with neither a vessel title nor leasehold, acted in the role of a shipping broker who had an exclusive arrangement permitting it to earn its profit if the contemplated arrangement between the shipper and a vessel owner or charterer (the broker itself or another party) was effectuated.

Were Poloron and Four Points treated as joint venturers both would, absent a contrary provision which is not present here, bear its own losses resulting from the negative outcome of a speculative venture. See generally "International Joint Ventures in the United States," 22 Columbia J Transnational Law 505 (1984); Weissberg, "Reviewing the Law of Joint Ventures With an Eye to the Future," 63 Southern Calif.L.Rev. 487 (1990); C. Nachmias & J. Nasuti, *Joint Ventures: Structuring Alternatives* (1988); Practising Law Institute, *Corporate Partnering* (1988).

■ Four Points was alerted by the rider to the Poloron–Four Points contract that Poloron's agreement with the manufacturer had to become "effective" before Poloron's agreement with Four Points agreement would become operational. Consequently, Four Points had, and was alerted to, a clear interest in investigating what problems if any the manufacturer confronted. If the manufacturer declined to cooperate with an inquiry by Four Points, for instance by refusing to reveal its financial condition, or if the information given was unfavorable, Four Points could draw the appropriate inference and decline to enter into its agreement with Poloron. Thus, both parties rather than merely Poloron were in a position to evaluate the risk. Under such circumstances it would be inappropriate to assume that given the con-

tract and rider language quoted above, the parties' intent was to place that risk solely on Poloron. See *TIAA v. Coaxial Communications*, 799 F.Supp. 16 (S.D.N.Y.1992) and authorities cited.

Interpreting the Poloron–Four Points contract and rider so as to permit Four Points to recover lost profits where it had no vessel, made no binding commitments to secure a vessel for the shipment and took no other irrevocable steps to implement the contemplated shipment, is a drastic remedy. It would create a one-sided allocation of risk where an event harmful to the financial interests of all parties aborted the transaction. To be sure, equally sophisticated business entities contracting at arm's length may agree to such a disposition if they wish, and absent public policy to the contrary, their agreement will be enforced. See *Overmyer v. Frick*, 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972); *Swarb v. Lennox*, 405 U.S. 191, 92 S.Ct. 767, 31 L.Ed.2d 138 (1972); *Lone Star Industries v. Nelstad Material Corp.*, 811 F.Supp. 147 (S.D.N.Y.1993).

Here, by contrast, after completion of all discovery desired by any party there is no evidence in any document, alleged conversion, or background circumstances suggesting that such an implausible uneven result was intended. See *Matsushita, supra; Friedman v. Egan*, 64 A.D.2d 70, 407 N.Y.S.2d 999 (2d Dept.1978).[4]

Thus, even absent the specific exculpatory clause in the Poloron–Four Points contract and its accompanying rider of May 6, 1991, interpretation of that contract on the assumption that each party was alert to its interests and would not agree to a position placing it at a disadvantage, yields a result protecting Four Points from loss of out-of-pocket expenses if the manufacturer failed to manufacture the cargo, but would not entitle

---

4. Were the words of the Poloron–Four Points contract and rider less clear, the same result would obtain under process of interpretation of legal documents laid down by Justice Harlan F. Stone in a constitutional context in *United States v. Classic*, 313 U.S. 299, 317–18, 61 S.Ct. 1031, 1039, 85 L.Ed. 1368 (1941):

To decide, we turn to the words of the [document involved] .. read in their historical setting as revealing the purposes of its framers, and search for admissible meanings of its words which, in the circumstances of their application, will effectuate those purposes.

Four Points to recover unliquidated potential lost profits from Poloron should that event occur. See generally Jones, "The Jurisprudence of Contracts," 44 UCincLRev 43 (1975); Farnsworth, "Disputes Over Omission in Contracts," 68 ColumLRev 860 (1968).

## VII

 Where damage is incurred because of a violation of legal norms, an award can be made based on the best estimate that can be made even though precise computation is not possible. *Texaco v. Hasbrouck,* 496 U.S. 543, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990); *Bigelow v. RKO Pictures,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). In contrast, where a damage claim is completely speculative, none can be awarded. *J. Truett Payne Co. v. Chrysler Motors,* 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981). No damages can be recovered if there is "no basis for a rational estimation" of the amount, if any. *Olympia Equipment Leasing v. Western Union,* 797 F.2d 370, 383 (7th Cir.1986). This is particularly so in contract cases:

> Contract law has long been held to preclude recovery for speculative damages.

*Roseburg Lumber Co. v. Madigan,* 978 F.2d 660, 667 (Fed.Cir.1992), citing *Story Parchment Co. v. Patterson Parchment Paper Co.,* 282 U.S. 555, 562–63, 51 S.Ct. 248, 250–51, 75 L.Ed. 544 (1931).

Four Points does not assert that any fixed cost-plus profit or liquidated damages is available to it under its contract with Poloron. Instead, it seeks losses of profits the existence and amount of which would have to be estimated without a reliable starting point.

Since Four Points did not own or charter a vessel, there is no way to know whether or not it would have been able to earn a profit.

To do so, Four Points would have to find and successfully bid for a charter of a reliable properly insured vessel in good condition with a qualified crew, willing to go to the desired destination, with known outgoing cargo from that destination or in spite of its absence, available at the right time at a price which would produce a profit for Four Points. Any assumption as to whether or not this would have occurred if the manufacturer had produced the prefabricated housing parts is speculative, and would launch the court into an inquiry with no defined boundaries—a result not favored. Compare *United States v. Trenton Potteries,* 273 U.S. 392, 397–98, 47 S.Ct. 377, 379–80, 71 L.Ed. 700 (1927) (Stone, J.).

## VIII

While interpretation of the Poloron–Four Points contract on the assumption that both parties were equally sophisticated indicates that Poloron may be liable to Four Points for the latter's out-of-pocket expenses, the parties have not separately addressed this question or the amount of out-of-pocket expenses which might be awarded.[5]

The denial of both parties' motions for summary judgment with respect to that issue is without prejudice to renewal upon submissions directed to that subject.

## IX

The cumbersome process of litigation is not necessarily the optimal one for resolving the remaining open question of Four Points' entitlement to out-of-pocket expenses. The parties are directed to consider use of alternate dispute resolution mechanisms, including selection by name of an impartial umpire with plenary authority to mediate or if necessary arbitrate the matter, utilizing such informal as well as formal means of factfinding

---

5. Four Points has offered no evidence that recovery of speculative lost profits is the norm in maritime charter brokerage where a voyage is aborted prior to commitments being made to any specific vessel owner or lessee. By contrast, contractual protection of a party incurring expenses in connection with an aborted transaction is at least to some extent common in similar contexts, as in the agreement dealing with the situation where a loan was agreed upon but not yet made when the transaction was aborted in *TIAA v. Coaxial Communications,* 807 F.Supp. 1155 (S.D.N.Y.1992); see earlier decision, 799 F.Supp. 16 (S.D.N.Y.1992).

as the umpire may find appropriate.[6]

SO ORDERED.

---

6. See generally *Sheet Metal Workers v. Baylor Heating*, 877 F.2d 547 (7th Cir.1989); Note, 3 Ohio StJDispute Resol # 2 at 385 (1988); Aufses, "Thinking About ADR," 16 Litigation # 3 at 33 (ABA Spring 1990); Panel Discussion, "Unique Problems and Opportunities for Permanent Umpireships," 42 Nat'l AcadArb Proceedings Ann Meeting 176 (1990).